[No. A072370. First Dist., Div. Three. Aug. 6, 1996.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF NAPA COUNTY, Respondent;
JOHN ROSS MOORE et al., Real Parties in Interest.

**COUNSEL**

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Gerald A. Engler and Peggy S. Ruffra, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Walter S. Risse, Terence Brennan, Mervin C. Lernhard, Jr., and Frank Worthington for Real Parties in Interest.

**OPINION**

**McGUINESS, J.*—**In *Baldwin v. Department of Motor Vehicles* (1995) 35 Cal.App.4th 1630 [42 Cal.Rptr.2d 422] (*Baldwin*), we held that the Department of Motor Vehicles (DMV) did not violate principles of double jeopardy when it revoked Mr. Baldwin's driver's license after it received notice of his third conviction for driving under the influence of alcohol. We analyzed the United States Supreme Court's opinions in *Department of Revenue of Mont. v. Kurth Ranch* (1994) 511 U.S. 767 [128 L.Ed.2d 767, 114 S.Ct. 1937] (*Kurth Ranch*), and *United States v. Halper* (1989) 490 U.S. 435 [104 L.Ed.2d 487, 109 S.Ct. 1892] (*Halper*), and concluded that they did not compel us to apply double jeopardy principles to driver's license revocations. (*Baldwin, supra,* 35 Cal.App.4th at pp. 1638-1642.)

The Napa County Superior Court has barred prosecution of drunk driving charges against 15 defendants who previously lost temporarily their licenses

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

in DMV administrative per se suspension proceedings. We disagree and reaffirm the principles stated in *Baldwin.* We direct issuance of a writ of mandate to vacate the superior court's order.

## Facts and Procedures

Between April 10 and August 31, 1995, the Napa County District Attorney filed complaints in the Napa County Municipal Court charging 15 defendants,[1] real parties in interest in this proceeding, with driving under the influence of alcohol and driving with a blood-alcohol level of .08 or more, in violation of Vehicle Code section 23152, subdivisions (a) and (b).[2] The DMV also suspended each defendant's driver's license for the same conduct under the administrative per se procedures described in section 13353.2, subdivision (a).

Under the administrative per se procedures, if a person is arrested for driving under the influence or with a blood-alcohol level of .08 or more, the arresting officer confiscates the driver's license, sends it to the DMV, and issues a 30-day license. During those 30 days, the driver may apply to the DMV for a hearing to contest loss of the license. Typically, the arresting officer does not appear at the administrative hearing and the hearing officer considers the arresting officer's sworn statement, the chemical test results, and the driver's record. The arrestee is given an opportunity to present testimony. (See generally, *Gikas* v. *Zolin* (1993) 6 Cal.4th 841, 846-847 [25 Cal.Rptr.2d 500, 863 P.2d 745] (*Gikas*).) The DMV suspends the driver's license for four months on a first offense and for one year if the driver has had another violation within the past seven years. (§ 13353.3, subd. (b)(1) & (2).)

The DMV administratively suspended the licenses of all 15 defendants, only 1 of whom requested a hearing. Simultaneously, the Napa County District Attorney was proceeding in the municipal court on a criminal complaint against each defendant. The defendants moved to dismiss the

---

[1]John Ross Moore, Angel Martinez Ramirez, Darryl Robert Clark, Sue Ann Curry, George Wake, John Claude Balek, Richard Blanton, Anthony Wilder, Robert Severino Paladini, William Fernandez San Augustin, Vernon Ivan Silva, Michael Lawrence Turner, Steven Francis Watras, Robert Scott Kirkman and David Paul Holstein.

[2]Unless otherwise indicated, all further statutory references are to the Vehicle Code.

complaints based upon the double jeopardy clauses of the United States and California Constitutions.[3] The motions to dismiss were denied.[4]

Defendants then petitioned the superior court for writs of prohibition.[5] After hearing, the court granted relief, ordering the municipal court to dismiss the charges against all 15 defendants. This petition by the People of the State of California followed.

### Double Jeopardy

In *People* v. *Prince* (1996) 43 Cal.App.4th 1174, 1177-1179 [51 Cal.Rptr.2d 138] (*Prince*), Division One of this court brought double jeopardy case law up to date: "The double jeopardy clause is one of the 'least understood and, in recent years, one of the most frequently litigated provisions of the Bill of Rights.' [Citation.] The United States Supreme Court has stated that '. . . the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction [hereinafter "successive prosecution"] and multiple punishments for the same offense [hereinafter "multiple punishments"].' [Citation.]

" 'A decade ago, the law was clear that civil forfeitures did not constitute "punishment" for double jeopardy purposes. In *United States* v. *One Assortment of 89 Firearms,* 465 U.S. 354 [79 L.Ed.2d 361, 104 S.Ct. 1099] (1984), the Supreme Court held that the claimant's prior acquittal on criminal charges did not bar a subsequent action for forfeiture under 18 U.S.C. § 924(d). Applying the test set forth in *United States* v. *Ward,* 448 U.S. 242, 248 [65 L.Ed.2d 742, 749, 100 S.Ct. 2636] (1980), the Court concluded that Congress intended forfeiture to be "a remedial civil sanction." *89 Firearms,* 465 U.S. at p. 363 [79 L.Ed.2d at pp. 368-369]. Accordingly, it held that the Double Jeopardy Clause did not apply.' [Citation.]

"The decisions of the Supreme Court in *United States* v. *Halper, supra,* 490 U.S. 435, and *Austin* v. *United States* (1993) 509 U.S. [602] [125 L.Ed.2d 488, 113 S.Ct. 2801] have, however, raised questions concerning

---

[3]Although in some respects the California Constitution provides greater double jeopardy protection than the United States Constitution (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 716-717 [87 Cal.Rptr. 361, 470 P.2d 345]), in this area, the United States Supreme Court decisions are more expansive. Therefore, our opinion addresses only the double jeopardy clause of the United States Constitution.

[4]Six of the defendants did not file motions, but entered written stipulations with the prosecutor to consider their motions to have been filed and to have been denied by the court.

[5]Only eight defendants filed writ petitions. The other seven entered stipulations requesting that the court treat them as if they had filed petitions.

the application of the double jeopardy clause when the government first obtains a criminal conviction and later seeks forfeiture of proceeds of illegal transactions that also gave rise to the criminal convictions, or conversely, attempts to criminally prosecute a defendant, after obtaining a judgment of civil forfeiture. The issue is now pending before the United States Supreme Court in *U.S.* v. *$405,089.23 U.S. Currency* [(9th Cir. 1994)] 33 F.3d 1210 (holding that civil forfeiture proceeding violated double jeopardy clause because defendants had already been convicted of same offenses), and *U.S.* v. *Ursery* (6th Cir. 1995) 59 F.3d 568, certiorari granted January 12, 1996, __ U.S. __ [133 L.Ed.2d 707, 116 S.Ct. 762] (vacating criminal conviction and sentence following entry of consent judgment in civil forfeiture of property used to facilitate offenses.)" (Fn. omitted.)

*Prince* held that prosecution for the manufacture and sale of methamphetamine was not barred by the double jeopardy clause where the district attorney first obtained four default judgments, none final yet, forfeiting personal property seized from the defendant's residence. (*Prince, supra,* 43 Cal.App.4th at pp. 1176-1179.) *Prince* criticized the Ninth Circuit decision in *U.S.* v. *$405,089.23 U.S. Currency* (9th Cir. 1994) 33 F.3d 1210, but *Prince* reversed dismissal of criminal charges because the forfeiture was not yet final and the defendant had defaulted in the forfeiture proceeding. (43 Cal.App.4th at pp. 1181-1186.)

In *Halper,* the defendant was first convicted of 65 counts of Medicare fraud, fined $5,000, and sentenced to 2 years' imprisonment. Each violation had lost the United States government $9, for a total loss of $585. The government then sought civil penalties of $2,000 for each violation. *Halper* considered whether subjecting Mr. Halper to $130,000 in civil damages for false claims amounting to $585, constituted a second punishment for the purposes of double jeopardy analysis. (*Halper, supra,* 490 U.S. at pp. 437-441 [104 L.Ed.2d at pp. 494-497].)

*Halper* concluded that "the labels 'criminal' and 'civil' are not of paramount importance. It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. . . . [T]he determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment. [¶] These goals are familiar. We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence. . . . [I]t follows that a

civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." (490 U.S. at pp. 447-448 [104 L.Ed.2d at pp. 501-502], fn. omitted.) The court concluded that ". . . under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." (*Halper, supra*, 490 U.S. at pp. 448-449 [104 L.Ed.2d at p. 502].)

*Halper* augmented its broadly stated rule with a caveat overlooked by some of the subsequent cases: "What we announce now is a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused." (*Halper, supra*, 490 U.S. at p. 449 [104 L.Ed.2d at p. 502].)

*Kurth Ranch* acknowledged *Halper*'s "rare case" caveat but held that Montana's tax on drug possession constituted punishment. Two weeks after Montana's drug tax went into effect, law enforcement officers raided the Kurths' farm, arrested them, and confiscated all the marijuana they found. The arrests led to criminal convictions, destruction of the drugs, and forfeiture of cash and equipment seized during the raid. In another proceeding, the Department of Revenue of Montana sought to collect $900,000 in taxes on the marijuana plants and related items. (*Kurth Ranch, supra*, 511 U.S. at pp. 770-773 [128 L.Ed.2d at pp. 773-775, 114 S.Ct. at pp. 1941-1943].)

As we explained in *Baldwin*, four factors convinced the *Kurth Ranch* court that Montana's tax constituted punishment: (1) it was conditioned upon commission of a crime; (2) the rate of taxation was extremely high—some four times the market value of the drugs; (3) the Montana Legislature stated its intent to use the tax as a deterrent; (4) the tax purported to tax property but was levied on goods the taxpayer no longer owned or possessed at the time of the assessment. (*Baldwin, supra*, 35 Cal.App.4th at pp. 1641-1642.) *Kurth Ranch* acknowledged that its case did not present the question of whether a criminal prosecution would be barred if the ostensibly civil proceeding designed to inflict punishment took place first. (*Kurth Ranch, supra*, 511 U.S. at pp. 781-782, fn. 21 [128 L.Ed.2d at p. 780, 114 S.Ct. at p. 1947].)

After *Halper* but before *Kurth Ranch*, Division Five of this court decided *Ellis* v. *Pierce* (1991) 230 Cal.App.3d 1557 [282 Cal.Rptr. 93] (*Ellis*). In *Ellis*, the DMV suspended a driver's license for refusal to submit to a

chemical test and the defendant pled guilty in related criminal proceedings and received a 48-hour enhancement to his jail term because of the refusal. Mr. Ellis challenged his license suspension on double jeopardy grounds. *Ellis* rejected the challenge, finding that the statute's purposes were to facilitate gathering evidence and to protect public safety by keeping drunk drivers off public roads. *Ellis* concluded that ". . . the suspension statute cannot be fairly characterized as a deterrent or retribution . . . ." (*Id.* at p. 1561.)

In *Baldwin*, the driver urged us to reject the *Ellis* conclusion because *Kurth Ranch* had extended the reach of double jeopardy. In *Baldwin*, the DMV had revoked Mr. Baldwin's driver's license after receiving notice of his third conviction for driving under the influence of alcohol. We first determined that the DMV had correctly applied the applicable statutes. We then rejected Mr. Baldwin's double jeopardy claim. We analyzed *Kurth Ranch* as follows: "[T]he court in *Kurth Ranch* indicated that the specific analysis that applies to determine whether a sanction constitutes punishment within the meaning of the double jeopardy clause varies depending upon the sanction under consideration. [Citation.] In distinguishing *Halper*, which involved a civil penalty rather than a tax, the court explained: '. . . tax statutes serve a purpose quite different from civil penalties, and *Halper*'s method of determining whether the exaction was remedial or punitive "simply does not work in the case of a tax statute." [Citation.] Subjecting Montana's drug tax to *Halper*'s test for civil penalties is therefore inappropriate.' [Citation.] Similarly, the license revocation here at issue is fundamentally different from a tax and serves a different purpose. Thus, Baldwin's attempt to apply the analysis in *Kurth Ranch* strictly is improper. (See *Helvering* v. *Mitchell* (1938) 303 U.S. 391, 399 [82 L.Ed. 917, 922, 58 S.Ct. 630] [one type of remedial sanction that 'is characteristically free of the punitive criminal element is revocation of a privilege voluntarily granted'].)

"Finally, revocation of Baldwin's license does not constitute punishment under the double jeopardy clause simply because, as Baldwin asserts, it may constitute a severe personal and economic hardship. '. . . [W]hether a sanction constitutes punishment is not determined from the [offender's] perspective, as even remedial sanctions carry the "sting of punishment." [Citations.]' [Citation.] Rather, we must make this determination by evaluating '. . . the purposes actually served by the sanction in question . . . .' [Citations.] Having determined that the purpose of section 13352 is to protect the public, we reject Baldwin's double jeopardy challenge." (*Baldwin, supra,* 35 Cal.App.4th at p. 1642.)

### The Superior Court's Decision

The superior court distinguished *Baldwin* because the DMV was required to revoke Mr. Baldwin's license after three convictions. In the court's view,

this made the DMV suspension part of the same proceeding as the criminal matter and the court further observed that it was "clear that the law of the land coming from the federal government is . . . going to be very similar to the case involving the drug cases [*sic*]."

The superior court based this conclusion upon two federal district court memorandum opinions filed in the Alexandria Division of the Eastern District of Virginia, neither opinion citing *Baldwin. Murphy* v. *Com. of Virginia* (E.D.Va. 1995) 896 F.Supp. 577, the first filed, involved prosecuting a driver whose license had been administratively suspended for seven days after an arrest for driving while intoxicated. *Murphy* first considered whether a federal court could enjoin a state criminal proceeding, as the habeas corpus petition asked it to do, and concluded it could not where double jeopardy was based upon multiple punishment, not multiple prosecution. (*Id.* at pp. 580-583.)

The *Murphy* court then opined in dicta about the strength of Mr. Murphy's double jeopardy claim: "Murphy has, nonetheless, presented a double jeopardy claim that is colorable, if not compelling. . . . Although the [Automatic License Suspension statute] serves remedial goals in part, it contains significant aspects of deterrence and retribution and therefore should be characterized as punishment. In addition, the rather arbitrary length of the suspension period (seven days) ensures that it is both longer than necessary to allow the driver time to sober up and shorter than necessary to allow any meaningful rehabilitation to occur. . . . The [Automatic License Suspension statute] is also tied directly to the guilt of the accused; if the underlying [driving while intoxicated] charge is dismissed or ends in acquittal, the suspension automatically terminates as well." (896 F.Supp. at pp. 583-584, fns. omitted.)

Two weeks later, in *U.S.* v. *Johnson*, Criminal No. 95-76-M, affirmed *sub nom. U.S.* v. *Imngren* (E.D.Va. 1995) 914 F.Supp. 1326, a United States magistrate dismissed on double jeopardy grounds criminal charges against a civilian whose privileges to drive on military installations had been administratively suspended for one year based upon an arrest for driving under the influence. The court focused not upon *Halper*'s "rare case" caveat or the extremity of the penalties sought in *Halper* and *Kurth Ranch* but instead upon language in those opinions which suggested that a penalty had to be solely remedial to escape the double jeopardy consequence.

The federal magistrate rejected proffered opinions from state courts involving state licenses suspended under statutes prohibiting driving while intoxicated. None of these state opinions were binding on the federal court

and most were decided before *Kurth Ranch*. (*U.S. v. Johnson, supra*, Crim. No. 95-76-M.) "Unlike the majority of license suspension schemes which have been upheld by other courts, the license suspension at issue is for one year, a period of such length that it can only be deemed deterrent or punitive in nature. . . . The suspension of an individual's installation driving privileges for one year does nothing to protect military installations, or society in general, from danger. It is common knowledge that blood alcohol content diminishes within a matter of hours, not months. Accordingly, the danger posed by any intoxicated individual, and the resulting necessity for remedial action, extends only for a period of hours. That is not to say that the same individual again could not impose a danger to the public by becoming intoxicated, and driving. Indeed, it is apparent that Army Regulation 190-5 was drafted in part to *deter* such a subsequent action. For this reason, Army Regulation 190-5 constitutes punishment within the meaning of the Double Jeopardy Clause." (*Ibid.*)[6]

### Stare Decisis

"Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. Otherwise, the doctrine of *stare decisis* makes no sense. The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California. Decisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state, and this is so whether or not the superior court is acting as a trial or appellate court. Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court. [Citations.]" (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Although the courts of California are bound by the decisions of the United States Supreme Court interpreting the federal Constitution, they are not bound by the decisions of lower federal courts, even on federal questions. Such decisions are persuasive and entitled to great weight, but they do not bind California courts. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

The Napa County Superior Court was able to follow the two federal decisions only if our contradictory determination in *Baldwin* that a license

---

[6]Shortly after the People filed their petition to this court, the chief judge of the Alexandria District sustained the magistrate's dismissal. (*U.S.* v. *Imngren, supra*, 914 F.Supp. at p. 1330.) Because of the length of the suspension and its independence from the criminal action, the chief judge concluded it was punitive, not merely remedial. (*Id.* at pp. 1329-1330.)

revocation was not punishment for double jeopardy purposes and *Ellis*'s similar conclusion should be characterized as dicta.

■ The distinction between an opinion's holding and mere descriptive language—dicta—is fundamental. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157 [278 Cal.Rptr. 614, 805 P.2d 873].) " ' "[T]he language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts." ' [Citations.] 'A litigant cannot find shelter under a rule announced in a decision that is inapplicable to a different factual situation in his own case, nor may a decision of a court be rested on quotations from previous opinions that are not pertinent by reason of dissimilarity of facts in the cited cases and in those in the case under consideration.' [Citations.]" (*Ibid.*)

■ Bearing these considerations in mind, we examine the holdings and the dicta of the important cases addressing the double jeopardy issue. *Halper* held that $130,000 in civil liability was sufficiently disproportionate to the government's expenses of no more than $16,000 to constitute a second punishment, but the Supreme Court gave the government an opportunity to prove its expenses were higher than $16,000 and possibly to defeat double jeopardy. (*Halper, supra,* 490 U.S. at p. 452 [104 L.Ed.2d at p. 504].) *Halper* also provided the following important dicta: "[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term" (at p. 448 [104 L.ed.2d at p. 502]); "a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution" (at pp. 448-449 [104 L.Ed.2d at p. 502]); "[w]hat we announce now is a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused. The rule is one of reason: Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as 'punishment' in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment." (*Halper, supra,* 490 U.S. at pp. 449-450 [104 L.Ed.2d at p. 502], fn. omitted.)

In *Austin v. United States* (1993) 509 U.S. 602 [125 L.Ed.2d 488, 113 S.Ct. 2801], the court held that civil forfeiture of a drug defendant's mobile-home and auto body shop could constitute punishment under the excessive

fines clause of the Eight Amendment, but the court remanded the matter for a determination of whether the forfeiture in that case was excessive. (*Id.* at pp. 604-605 [125 L.Ed.2d at pp. 494-495].) *Austin* restated *Halper*'s dictum that a civil sanction is punishment if it does not solely serve a remedial purpose. (*Id.* at p. 610 [125 L.Ed.2d at p. 498].)

*Kurth Ranch* held that Montana's drug tax was punishment and violated the double jeopardy clause. (*Kurth Ranch, supra,* 511 U.S. at pp. 783-784 [128 L.Ed.2d at pp. 781-782, 114 S.Ct. at p. 1948].) In dicta *Kurth Ranch* observed that taxes are typically motivated by revenue raising rather than punitive purposes, but acknowledged that taxes could cross the line into punishment. The court also suggested criteria for determining when taxes would cross the line. (*Kurt Ranch, supra,* 511 U.S. at pp. 780-784 [128 L.Ed. at pp. 779-781, 114 S.Ct. at pp. 1946-1948].)

*United States* v. *Ursery* (1996) 518 U.S. __ [135 L.Ed.2d 549, 116 S.Ct. 2135], decided after we heard oral argument in this case, did not address the issue we face. The court there held that ordinary in rem drug forfeiture proceedings were not criminal punishment under the double jeopardy clause. *Ursery* clarified the distinction between in rem proceedings against crime-involved property and in personam civil penalty proceedings against persons charged with crime. (*Id.* at pp. __-__ [135 L.Ed.2d at pp. 562-568, 116 S.Ct. at pp. 2142-2147].)

Driver's license suspensions are completely unlike the massive civil fines in *Halper* and the drug tax in *Kurth Ranch.* Consequently, California courts are not bound by stare decisis to conclude that driver's license suspensions are punitive within the meaning of the double jeopardy clause. The question in California is whether the United States Supreme Court's statements about the double jeopardy clause lead necessarily to the conclusion that driver's license suspensions are punitive. In *Ellis* and *Baldwin* courts of this district have held that the Supreme Court opinions do not lead to that conclusion.

In *Ellis,* the court held that suspending a driver's license for refusing to submit to a chemical test did not violate the double jeopardy clause because it was not punitive. (*Ellis, supra,* 230 Cal.App.3d at pp. 1561-1562.) Defendants here contend that *Ellis* is not controlling law because: (a) the California Supreme Court recognized in *Gikas, supra,* 6 Cal.4th 841, that driver's license suspension statutes are punitive; (b) *Ellis* did not hold that administrative per se suspensions for refusals are solely remedial; they also facilitate gathering evidence; (c) *Ellis* read the double jeopardy clause more restrictively than the federal courts do.

Defendants' reference to *Gikas* exemplifies treating a dictum as if it were a holding. *Gikas* held that a criminal court's determination that a defendant

was illegally arrested for driving under the influence did not bar the DMV from redetermining the question during administrative proceedings to suspend the driver's license. (6 Cal.4th at pp. 844-845.) During extensive introductory discussion of the statutes, the *Gikas* court quoted language from another opinion (*Bell* v. *Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 312 [13 Cal.Rptr.2d 830]), referring to legislative history of the administrative per se statutes. Therein, *Gikas* characterized suspending licenses as "sanctions" and mentioned the "deterrent" effect of license suspension statutes. (6 Cal.4th at p. 847.)

The true role of this dictum was merely to set the stage for interpreting the statutes and for discussing collateral estoppel. The defendants are incorrect when they assert that *Gikas* "predicated its holding on the premise that license suspensions, pursuant to the administrative per se statutes, *punish* drivers who have historically escaped punishment in the criminal justice system."

*Ellis* is different from these 15 cases in only one significant respect. Mr. Ellis's license was suspended because he refused to submit to chemical testing. These defendants' licenses were suspended because the tests revealed intoxication. This distinction does not dictate a different analysis of the double jeopardy issue. Suspension of these defendants' licenses is not rendered "punitive" by the fact that the particular statute involved here did not also facilitate gathering evidence, as did the statute involved in *Ellis*.

*Ellis*'s most persuasive observations apply to this case: "The suspension of a driver's license after refusal to take a chemical test is closely analogous to the disbarment or suspension of an attorney after conviction of a crime involving moral turpitude. (Bus. & Prof. Code, § 6101.) The attorney's disbarment or suspension does not constitute a second punishment in violation of the double jeopardy clause because the State Bar proceeding is ' "*sui generis*, neither civil nor criminal in character." ' [Citations.] This is because the purpose of the disbarment or suspension is not to punish, but to protect the public from unfit lawyers. That purpose is 'reminiscent of' but nevertheless distinct from the criminal process. [Citations.]

"Just as the purpose of attorney disbarment or suspension is to protect the public by keeping unfit lawyers from practicing law, the long-range purpose of a driver's license suspension is to protect the public by keeping unfit drivers from driving. If the former is not punishment for purposes of double jeopardy analysis, the latter must not be, either." (*Ellis, supra,* 230 Cal.App.3d at pp. 1561-1562.)

*Ellis* was decided before *Kurth Ranch*. However, in *Baldwin* we analyzed both decisions and concluded that *Ellis* was still sound law. (*Baldwin, supra,*

35 Cal.App.4th at pp. 1639-1643.)[7] The superior court here purported to find a distinction between *Baldwin* and these 15 cases because the DMV had a duty to revoke Mr. Baldwin's license after 3 offenses. In the superior court's view, this prevented considering the criminal case and the DMV revocation to be separate actions for double jeopardy purposes. In the same vein, defendants suggest that in *Baldwin* the DMV conducted no administrative proceedings in connection with the mandatory revocation.

We conclude this distinction furnishes no ground for declining to follow *Baldwin*. The DMV revocation in *Baldwin* was a separate action by a different agency, just as the administrative per se suspension proceedings by the DMV are separate from the criminal prosecutions against these 15 defendants. Although the DMV was obligated to revoke Mr. Baldwin's license, this obligation was no stronger than the DMV's obligation to suspend licenses under the administrative per se statutes.[8]

Let a peremptory writ of mandate issue directing the Napa County Superior Court to vacate its order compelling the municipal court to dismiss the charges against real parties in interest.

Corrigan, Acting P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied September 12, 1996, and the petition of real parties in interest for review by the Supreme Court was denied November 13, 1996. Chin, J., did not participate therein.

---

[7] In *Allen* v. *Attorney General of State of Maine* (1st Cir. 1996) 80 F.3d 569, 576-577, the First Circuit also found that *Kurth Ranch* did not dictate the result in a drunk driving case. The court there equated the driver's license suspension statute to other license suspension statutes designed to protect the public.

[8] Defendants say that the DMV was not obligated to suspend their licenses, but they do not explain how the DMV could avoid the mandate of sections 13353.2 and 13353.3.