[No. G030056. Fourth Dist., Div. Three. Nov. 5, 2003.]

MITSUBISHI MATERIALS CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
FRANK H. DILLMAN et al., Real Parties in Interest.

## COUNSEL

Morrison & Foerster, Kathleen V. Fisher, Arne D. Wagner, H. Mark Mersel, John A. Kelley; O'Melveny and Myers, Brett J. Williamson, Vicki A. Nash, John H. Beisner, John F. Niblock; Pillsbury Winthrop, Barbara L. Croutch, Nathan M. Spatz; Bingham McCutchen, David M. Balabanian, Christopher B. Hockett, Thomas S. Hixon, Matthew E. Digny and Heidi A. Leider for Petitioners.

Robert D. McCallum, Jr., United States Assistant Attorney General, John S. Gordon, United States Attorney; Mark Stern, Douglas Hallward-Driemeier, Kathleen Kane; James G. Hergen and Lara A. Ballard for the United States of America as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Herman, Mathis, Casey, Kitchens & Gerel, David S. Casey, Jr. and Bonnie E. Kane for Real Parties in Interest.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Catherine Z. Ysrael and Angela Sierra, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

**SILLS, P. J.—**

### Prologue

Our original opinion in this matter was filed February 6, 2003. The California Supreme Court granted review on April 30, 2003. While the case was pending before that court, the United States Supreme Court handed down *American Ins. Ass'n v. Garamendi* (2003) 539 U.S. 396 [156 L.Ed.2d 376, 123 S.Ct. 2374]. The *Garamendi* case held that California's Holocaust Victim Insurance Relief Act was unconstitutional, because it conflicted with express federal policy concerning the recovery of insurance proceeds confiscated by Nazi Germany. In light of *Garamendi*, the California Supreme Court transferred this case back to this court, with instructions to vacate our earlier decision and reconsider the matter in light of the federal court's *Garamendi* opinion.

The interim has also given us the benefit of *Deutsch v. Turner Corp.* (9th Cir. 2003) 324 F.3d 692, a Ninth Circuit decision holding that the very law at issue before us—which allows former American POW's forced to do slave labor for Japanese companies during World War II to sue those companies—is unconstitutional because it intrudes on the federal government's power to make and resolve war claims. (See *id.* at p. 712.) That decision was made final only a few weeks ago (Oct. 6, 2003) with the denial of the POW's petition to have the United States Supreme Court take the case.

We now vacate our prior decision and issue this new opinion in light of both of these two federal court decisions, plus the additional briefing submitted by both sides after the Supreme Court transferred the case back to this court.

## I. INTRODUCTION

Before us are claims by surviving American prisoners of war against a number of Japanese companies for whom they were forced to do slave labor during World War II. It is a remarkable case, one in which the Attorney General of the United States and the Attorney General of the State of California are on opposite sides.

The immediate cause of the litigation is a relatively recent change to our state law which was intended to allow "Second World War slave labor" victims to bring a lawsuit to recover compensation under state law for their labor against private companies who benefited by that labor during the war. (Code Civ. Proc., § 354.6.)[1]

Make no mistake about it—this legislation actually creates *new* claims that would not otherwise exist. (See *Deutsch v. Turner Corp., supra*, 324 F.3d at p. 707 ["Regardless of any pre-existing law, the California legislature chose to create a specific cause of action for persons subjected to slave labor by the Nazis and their allies and sympathizers."].) As the Ninth Circuit's *Deutsch* decision points out, the law defines a class of plaintiffs who may sue, sets forth a method for measuring damages, and establishes a special rule for corporations affiliated with any Nazi ally. (*Ibid.*) And as should be obvious to anyone, any arguable causes of action under California law which American POW's might have possessed against Japanese nationals or corporations for conduct during World War II have long since expired. The *only* way the plaintiffs in the case before us now could have a viable lawsuit against a Japanese corporation for conduct which ended almost 60 years ago is under this new law.[2]

The specific plaintiffs here are survivors of Japanese prisoner of war camps who have brought this lawsuit against a group of Japanese companies, mainly

---

[1] Subdivision (b) of Code of Civil Procedure section 354.6 provides in pertinent part: "Any Second World War slave labor victim . . . may bring an action to recover compensation for labor performed as a Second World War slave labor victim . . . from any entity or successor in interest thereof, for whom that labor was performed, either directly or through a subsidiary or affiliate." (All further statutory references in this opinion are to the Code of Civil Procedure, and specifically to section 354.6 of that code.)

[2] The statute was enacted in 1999. Structurally, subdivision (b) of section 354.6 (see fn. 1, above) creates the claim, while subdivision (c) makes clear that the statute of limitations does not run on it until 2010. Subdivision (c) provides: "Any action brought under this section shall not be dismissed for failure to comply with the applicable statute of limitation, if the action is commenced on or before December 31, 2010." In this opinion we do not deal with the question of whether the state Legislature, consistent with the due process clauses of the state and federal Constitutions, can revive state tort claims (e.g., battery) that had long ago expired under their applicable statute of limitations.

Mitsubishi and Mitsui, for which they were forced to work in World War II. The trial court overruled the demurrers of the Mitsui companies and denied the motion for judgment on the pleadings brought by the Mitsubishi companies.

Ordinarily appellate courts are reluctant to entertain writ proceedings based on erroneously overruled demurrers or improperly denied judgments on the pleadings. However, because the plaintiffs are World War II veterans, this case clearly merits expeditious consideration. These plaintiffs are heroes, who endured some of the worst privations *ever* visited on American prisoners. It would be a disservice to them to create a false hope of monetary recovery by permitting a lengthy trial only to reverse the judgment years later because federal law required it. Regrettably however, as we explain below, the 1951 peace treaty that formally ended World War II between the United States and Japan expressly preempts the state law which would otherwise allow these plaintiffs to sue.

There is no way to avoid confrontation with the terms of the 1951 treaty. The United States Supreme Court's *Garamendi* opinion in the Holocaust insurance case was a five-to-four decision, which turned on just exactly how *clear* a federal policy must be before state action is preempted by the federal government's foreign affairs power. Much of Justice Ginsburg's dissent in that decision was devoted to making the argument that the executive branch's efforts to secure the payment of insurance claims otherwise owed Holocaust survivors were simply not *express* enough. (E.g., *Garamendi, supra,* 539 U.S. at p. 430 [123 S.Ct. at p. 2395] (dis. opn. of Ginsburg, J.). She, along with Justices Stevens, Scalia, and Thomas wanted a "clear statement" in some "formal expression of foreign policy" before they would take the step of invalidating a state law. (*Ibid.*) Obviously, the *Garamendi* majority disagreed. For them the conflict between various federal executive agreements and California's Holocaust insurance relief was "sufficiently clear" to "require finding preemption." (*Id.,* at p. 420 [123 S.Ct. at p. 2390].)

Along these lines, the plaintiffs, in briefing received after the transfer from the Supreme Court, build their argument on the premise that the *Garamendi* majority did not go so far as to say that mere "field preemption" was enough to invalid state legislation which happened to wander into that field. (See *Garamendi, supra,* 539 U.S. at p. 419–420 [324 S.Ct. at p. 2389] ["It is a fair question whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption . . . but the question requires no answer here."].) Rather, the plaintiffs here assert that *Garamendi* relied on an *express* conflict, and then they say that the only evidence of federal occupation is the treaty, and the treaty does not preclude their lawsuit. So we have no choice but to confront the terms of the treaty.

The very process of explaining the treaty, however, also requires that we recognize the sacrifice of these plaintiffs. That sacrifice deserves to be explicitly recognized by the judiciary of this country, regardless of what the treaty said or the validity of the legal claims they are now making—indeed, all the more so in light of our determination that the 1951 treaty precludes this lawsuit. The unique circumstances of this case, including the special nature of the plaintiffs' claims arising out of a world war, compel the conclusion that these plaintiffs be given a forthright, honest explanation why their government waived their rights to seek redress in American courts against the companies that benefited from their slave labor.

## II.   BACKGROUND OF THE 1951 TREATY

### A.   Preliminary Considerations

We must begin by acknowledging the obvious:   ■   The 1951 treaty was made by the federal government of the United States, and it is binding on us as a state court. In fact, the Constitution specifically mentions *state courts* in making treaties the "supreme Law of the land." Article 6 of the United States Constitution provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." As a treaty it therefore trumps any law of the State of California, whether that be framed as a matter of "preemption" under *Garamendi* or simply because there is an outright conflict.

■   While treaty analysis obviously begins with the text of the treaty itself (e.g., *El Al Israel Airlines, Ltd. v. Tseng* (1999) 525 U.S. 155, 167 [142 L.Ed.2d 576, 119 S.Ct. 662]), federal and state courts regularly look to the historical context of a treaty to elucidate its meaning, particularly where any terms are ambiguous or where the treaty is silent on a point. (E.g., *Hosaka v. United Airlines, Inc.* (9th Cir. 2002) 305 F.3d 989, 998 [because Warsaw Convention was silent on the availability of the doctrine of forum non conveniens, court considered historical context in which particular amendment had been offered]; *Bruguier v. Class* (1999) 1999 S.D. 122 [599 N.W.2d 364, 374–375] [looking to historical context of treaty to determine whether a particular Indian reservation would continue].)

Because " '[t]reaties are construed more liberally than private agreements, to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.' " (*Air France v. Saks* (1985) 470 U.S. 392, 396 [84 L.Ed.2d 289, 105 S.Ct. 1338]; accord, *Chan v. Korean Air Lines* (1989) 490 U.S. 122,

134 [104 L.Ed.2d 113, 109 S.Ct. 1676] [recognizing that drafting history may be consulted to shed light on ambiguous text of treaty (opinion by Scalia, J.)].) Even plain language must be viewed in its historical context. (*Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe* (1985) 473 U.S. 753, 774 [87 L.Ed.2d 542, 105 S.Ct. 3420] ["even though 'legal ambiguities are resolved to the benefit of the Indians,' . . . courts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' . . . clearly runs counter to a tribe's later claims"]; see also *Curry v. U.S. Forest Service* (W.D. Pa. 1997) 988 F.Supp. 541, 548 [noting that historical context of migratory bird treaty further demonstrated the intent of the treaty beyond its text not to apply to the federal government itself].)

■ In the present case, historical context is particularly important because it eliminates any doubt in the language as to whether the treaty was intended to cover the claims of American POW's against private Japanese companies. To the degree that the 1951 treaty may arguably be vague (in the sense that people of ordinary intelligence have to guess at the meaning of words) or ambiguous (in the sense that words have multiple meanings),[3] clarification by reference to the surrounding circumstances under which the agreement was made can serve as a test of the validity of any adjudication of the bare treaty language.[4]

---

[3] There are three areas of the treaty that might arguably fit these definitions. One, in Article 14(b) of the treaty, the victorious Allied nations "waive" claims of "their nationals" arising out of the "prosecution" of the war against Japan and Japanese "nationals." According to the plaintiffs, the word "waive" should not be construed to extinguish actions brought in American state courts under state law because the reference to the claims of the Allied Powers and their nationals necessarily implicates *international* claims only. Along those same lines, the argument is that the reference to Japanese "nationals" raises the question of whether the word should be construed to include corporate entities, such as the defendants here, which have, in the post-war era, grown into large multinational corporations.

Two, Article 14(b) uses the phrase "prosecution of the war." According to the plaintiffs, the word "prosecution" should not be interpreted to include actions which are contrary to international law. In particular, they point out that while the 1929 Geneva Convention (specifically Article 31) allowed POWs to be forced to do labor, that labor cannot have any connection with the operation of the war (such as putting POWs to work making munitions). They reason that since their own labor was in connection with the Japanese war effort, it was "illegal" under the Geneva Convention and therefore not part of the "prosecution" of the war.

Three, plaintiffs place great stress on the differences between Article 14—where Allied claims are waived—and does *not* parallel Article 19—where the Japanese waive *their* claims against the Allied powers and their nationals. What's more, the Japanese waiver in Article 19 contains a specific reference to Japanese POW's, yet the Allied waiver in Article 14 contains no specific reference to Allied POW's. For the plaintiffs, the asymmetry is itself significant, in that it shows that the claims of Allied POW's, unlike the claims of Japanese POW's, were not being waived.

[4] It is clear from the tenor of the plaintiffs' arguments that they believe there should be a *trial* as to the circumstances of the 1951 treaty. But at least the broadest circumstances behind the treaty cannot seriously be disputed. Thus, ironically enough, most of the discussion in this

## B. The Maltreatment of American POW's

The proper place to begin is with the sufferings endured by Americans taken prisoner by the Japanese in World War II.

Most of the plaintiffs were taken prisoner in the spring after the surrender of Bataan in April 1942.[5] Then came the infamous Bataan Death March, where prisoners, most weak and ill, were prodded by bayonets to march in the tropical heat for six days and nights with hardly any food and water.[6] If they failed to keep up they were run through.

The prisoners were eventually put into "hell ships" to be taken to Japan. POW ships are supposed to be marked, so that one side does not attack its own nationals. The hell ships, however, were unmarked, and in fact a number were sunk by American submarines en route to Japan.[7]

The conditions were horrendous, and bespoke gratuitous cruelty. The prisoners were packed like sardines into hatches, which were always sealed; sick prisoners could not get air. Typically the prisoners were not allowed to empty the oilcans used as latrines more than twice a day, despite the fact that most of them were suffering from diarrhea, and the cans were overflowing.[8]

Once in Japan, the prisoners were forced into slave labor for private Japanese companies (usually mining) that supplied the Japanese war effort.

---

opinion about the historical circumstances of the treaty draws either from (a) sources of which the *plaintiffs themselves* have asked us to take judicial notice, such as a Senate report that was clearly the product of hearings favorably disposed to the plaintiffs' claims and a New York Times article; (b) sources which explicitly advocate the plaintiffs' position (mainly the Holmes book referenced in fn. 7 below); (c) a United States Supreme Court case (the *Kawakita* opinion); or (d) the presidential papers of President Harry Truman.

[5] The plaintiffs have helpfully provided the record of the hearings of the United States Senate Judiciary Committee entitled "Former U.S. World War II POW's: A Struggle for Justice," dated June 28, 2000 (see Hearing before Sen. Com. on Judiciary, 106th Cong., 2d Sess. (2000)) (hereafter Senate Report). The Senate Report contains the testimony of a number of the surviving POWs. We take judicial notice of this report.

[6] See, e.g., Senate Report, *supra*, at page 30 (prepared statement of Harold W. Poole).

[7] As many as 21 unmarked merchant ships transporting American POW's were torpedoed. (See Holmes, Unjust Enrichment: How Japan's Companies Built Postwar Fortunes Using American Pows (2001) at p. 33) (hereafter Unjust Enrichment).)

[8] More graphic descriptions of conditions aboard the hell ships may be found in Chapter 4 of Unjust Enrichment, aptly entitled Voyages in Hell. (See Unjust Enrichment, *supra*, at pp. 33–43.)

As the plaintiffs themselves now point out, the use of that forced labor was contrary to clearly established international law regarding the use of the labor of prisoners of war.[9]

The experience of Frank Bigelow, a veteran of Corregidor, was typical: "Everyday the Japanese Army delivered us to a coal mine owned by Mitsui, one of the biggest business conglomerates in Japan, and we were their slave labor. Mitsui Mining was right up there in front and we were told to work or die—long hours, short rations. Usually, tiny portions of rice and seaweed soup could barely sustain us as we were doing physical, heavy labor. I was skin and bones, and at 6 foot, 4 inches, I weighed just 95 pounds."[10]

There were constant beatings, which would increase whenever the United States won an important battle.[11] Over 11,000 of the 27,000 some Americans captured and interned by the Japanese military during World War II died. Chinese prisoners of war fared even worse. Of the tens of thousands captured, at war's end Japanese authorities acknowledged having only 56 Chinese prisoners.[12]

## C.    Postwar Reactions to that Maltreatment

The enslavement of American POW's to benefit the Japanese war effort and private Japanese companies was well known after the War. In 1947, the British held war crime trials in Hong Kong, indicting civilian employees of the Nippon Mining Company for the maltreatment of prisoners of war forced

---

[9] See Unjust Enrichment, *supra*, at page 25 ("It would have been hard to find a POW company worksite in Japan during World War II that was *not* directly related to war production.") (original italics). This was in direct contravention of Article 31 of the 1929 Geneva Convention, which states that POW work "shall have no direct connection with the operations of the war." Holmes captures the extreme psychological oppression in the practice, quoting former POW Robert O'Brien: " 'You can't imagine what it was like, each day, being made to manufacture weapons of war to be used against your own brothers!' " (Unjust Enrichment, *supra*, at p. 27.)

[10] See Senate Report, *supra*, at page 31 (statement of Frank Bigelow). The pattern of being delivered by the Japanese Army every morning to a private company to work was repeated in the statement of Bataan Death March survivor Maurice Mazer: "I was imprisoned in Hanawa Camp in Japan. Each morning, the Japanese soldiers turned me and my fellow prisoners of war over to the guards for Mitsubishi Mining, a private company which enslaved us for its own profit and forced us to work in its copper mines and smelter mines." (Sen. Rep., *supra*, at p. 32.)

[11] Senate Report, *supra*, at page 34 (statement of former POW Lester I. Tenney).

[12] See Bix, Hirohito and the Making of Modern Japan (2000) page 360.

to labor in the Kinaseki Mine in Formosa. Eight of the nine were found guilty and sentenced to various terms of imprisonment.[13]

Then there was the postwar prosecution in American courts of Tomoya Kawakita for treason. Kawakita was an American citizen who had been hired to work for a private mining company interpreting communications with POW's who were "mostly from Bataan" and who were forced to work in his company's mines. (See *Kawakita v. United States* (1952) 343 U.S. 717, 737 [96 L.Ed. 1249, 72 S.Ct. 950].) Kawakita returned to the United States in 1946, but was recognized by former American POW's, arrested, and tried for treason. (*Id.* at p. 721.) Reviewing the evidence, the federal district court had said in 1950 that by "his brutal, slave-driving tactics," Kawakita had "added many tons of nickel ore to Japan's war effort that never otherwise would have been mined or smelted by American prisoners of war." (*United States v. Kawakita* (S.D.Cal. 1950) 96 F.Supp. 824, 837.)

After the war, Japanese-owned assets in the United States and its territories were seized by the Office of Alien Property, which operated under the auspices of the United States Justice Department. State Department estimates place the total amount seized at about $90 million.[14] The proceeds were placed in a War Claims Fund for ultimate distribution to the POW's. It amounted to $1.00 a day for missed meals and $1.50 per day for lost wages.[15]

### D. Considerations Leading to the 1951 Peace Treaty

When most Americans think of the end of the war with Japan they think of the formal surrender ceremony on the battleship Missouri that took place in September 1945 shortly after the bombing of Hiroshima and Nagasaki. Most do not realize that it was not until the early 1950's, in the midst of another war, that the treaty formally ending World War II with Japan was finally negotiated and concluded.

There can be no doubt that the Korean War gave a special impetus to concluding the treaty with Japan. The main theme of President Truman's opening address to the conference on the Japanese Peace Treaty, held at the same San Francisco opera house where the United Nations was founded, was the need to "restore" a sovereign Japan to the company of American allies so that it could help serve as a bulwark against communist aggression in Korea.

---

[13] See Ramasastry, *Corporate Complicity: From Nuremberg to Rangoon: An Examination of Forced Labor Cases and Their Impact on the Liability of Multinational Corporations* (2002) 20 Cal. J. Intl. L. 91, 113–117.

[14] Senate Report, *supra*, at page 50 (responding to questions posed by Chairman Hatch).

[15] Senate Report, *supra*, at page 2 (statement of Chairman Hatch).

(See Public Papers of the Presidents of the United States, Harry S. Truman, 1951 (U.S. Gov. Printing Office 1965) pp. 504–508 (hereinafter Truman Papers).)

In his address Truman recounted the changes which had occurred in Japan in the short span of six years. The secret police had been abolished. The Japanese people had a new constitution with a bill of rights. Universal suffrage had been established. There were now free and independent labor unions. It was time "to restore full sovereignty to the Japanese people." (Truman Papers, *supra*, at pp. 504, 505.)

Truman then stressed the urgency of the task by alluding to recent military offensives launched in Korea. "Unfortunately, today, the world is faced with new threats of aggression. Many of the countries represented here are now engaged in a hard fight to uphold the United Nations against international lawbreaking. There are thugs among nations, just as among individuals." (Truman Papers, supra. at p. 504.)

Truman also spoke about the subject of reparations, in words that have particular significance to the case at bar. He reminded his audience that the United States had not forgotten Bataan (Truman Papers, *supra*, at p. 505). But he juxtaposed that thought with another one, going in the opposite direction: The new treaty did not "contain the seeds of another war." (*Id.*, at p. 506.) The tenor of Truman's remarks was that Japan was being welcomed into the company of Allied nations *despite* what had happened during World War II.

The reference to "seeds of another war" was an obvious allusion to the Versailles treaty that had ended World War I. John Foster Dulles, the chief American negotiator of the treaty that ended World War II with Japan, had himself been at the Versailles negotiations, and had in fact served on the Reparations Commission. Historians, of course, may debate the causes of World War II forever, and in particular the role heavy reparations against Germany may have played.[16] We need not enter that fray. However, it is clear

---

[16] Recently the idea has come under fire (see MacMillan, Paris 1919: Six Months That Changed the World (Random House 2001) p. 493 [arguing that to assign blame to the Second World War "is to ignore the actions of everyone—political leaders, diplomats, soldiers, ordinary voters—for twenty years between 1919 and 1939"].) Even MacMillan, however, recognizes the role Versailles played as a conventional explanation for World War II. (See *ibid.* ["Later it became commonplace to blame everything that went wrong in the 1920s and 1930s on the peacemakers and the settlements they made in Paris in 1919 . . . ."]) And there is no doubt that the terms of the Versailles treaty had been exploited by Hitler for propaganda reasons. (See *ibid.* ["Hitler did not wage war because of the Treaty of Versailles, although he found its existence a godsend for his propaganda."].) The conventional view that Versailles directly led to World War II is probably still regnant. (See, e.g., *ibid.* [quoting the special millennium issue of the Economist magazine to the effect that " 'The final crime' " was " 'the

that the key American decision maker involved in the treaty, John Foster Dulles, accepted the conventional wisdom of his day that heavy reparations against Germany *had* played a major part in bringing about the rise of Hitler and the subsequent war.[17]

The need to spare the Japanese economy from heavy reparations was also a major reason the Senate Foreign Relations Committee was willing to go along with the treaty. In its report recommending approval of the treaty, the committee said: "Obviously insistence upon the payment of reparations in any proportion commensurate with the claims of the injured countries *and their nationals* would wreck Japan's economy, dissipate any credit that it may possess at present, destroy the initiative of its people, and create misery and chaos in which the seeds of discontent and communism would flourish." (Sen. Rep. No. 82d Cong., 2d Sess. (1952), italics added.)

Besides the need to cultivate Japan as an American ally against Communist aggression and the concomitant need to protect its economy from heavy reparations, there was another motivating force for the 1951 treaty, though not one mentioned by Truman: The danger of a cycle of recriminations when each side perceives itself to have been the object of grievous wrongs. There was a need for a mutual release of war claims so bygones could be bygones.

---

Treaty of Versailles, whose harsh terms would ensure a second war.' "]; Alford, *On War As Hell* (2002) 3 Chi. J.Internat.L. 207, 210 ["The consequences of the Treaty of Versailles were devastating for Germany. Germany agreed to pay reparations for all damage caused by the war, amounting to over $30 billion. . . . [¶] Many Germans greatly objected to the War Guilt clause and resented the onerous reparations they were forced to pay as a result of the Treaty of Versailles. . . . The seeds of discontent were sown at Versailles and bore devastating fruit in the Second World War."].)

[17] A point made with some force in a New York Times article cited to us by the plaintiffs and obtained from the Internet, Clemons, *Recovering Japan's Wartime Past—and Ours N.Y. Times* (Sept. 4, 2001) p. 23. ("Dulles had been a United States counsellor at the Paris Peace Conference in 1919, with special responsibility for reparations. He had opposed, without much success, the heavy penalties imposed by the Allies on Germany. These payments were widely seen as responsible for the later collapse of Germany's economy and, if obliquely, for the rise of Nazism. After World War II, Dulles feared that heavy reparations burdens would similarly cripple Japan, make it vulnerable to Communist domination and prevent it from rebuilding. It was crucial to Dulles that Japan not face claims arising from its wartime conduct.") See also MacMillan, Paris 1919: Six Months That Changed the World, *supra*, at page 467 ("And so Article 231, a clause that the young John Foster Dulles helped to draft as a compromise over reparations, became the great symbol of the unfairness and injustice of the Treaty of Versailles in Weimar Germany, in much subsequent history—and in the English-speaking world.").

The New York Times piece hardly contains any revelations about Dulles. He had long been on record as opposing reparations, having written an article for the May 1921 issue of Foreign Affairs, *How Reparation Defeats Itself.*

We have already mentioned the suffering of American prisoners of war endured at the hands of the Japanese Army and at the hands of private Japanese companies. What we have not mentioned to this point is that the Japanese felt that they too had claims. Few Americans are aware that in 1963 a Japanese court, in what has become known as the *Shimoda* case, held that the United States had violated international law by bombing Hiroshima and Nagasaki.[18] Regardless of whether one agrees with that decision (in fact, in an ironic twist, in the *Shimoda* case the Japanese government took the *American* side and argued that the United States hadn't violated international law), the main significance of the case for our purposes is what the court actually did. It found *against* the plaintiffs because even though the *Shimoda* court was willing to say that the United States had in fact violated international law, it also said that Japan had waived the right of its nationals to recover against the United States because of the 1951 treaty.

The use of nuclear weapons at Hiroshima and Nagasaki and the treatment of American POWs in Japan were not unrelated events. In fact, one of the main reasons given by President Harry S. Truman for the use of nuclear weapons on Hiroshima and Nagasaki was the mistreatment of American prisoners of war. In a radio address to the American people on the very day of the Nagasaki bombing,[19] Truman said: "Having found the bomb we have used it. We have used it against those who attacked us without warning at Pearl Harbor, against those who have starved and beaten and executed American prisoners of war, against those who have abandoned all pretense of obeying international laws of warfare."

Without a waiver of all war crime claims that could have been brought by either side, Japan and the United States might have wrangled endlessly about liabilities arising out of the war.[20]

---

[18] The standard source in English for the decision is a secondary one, Falk, *The Shimoda Case: A Legal Appraisal of the Atomic Attacks Upon Hiroshima and Nagasaki* (1965) 59 Am. J.Internat.L. 759 (hereinafter Falk). While the (hard to find) Japanese Annual of International Law for 1964 provides a full English translation of the opinion, a translation was obtained from the Internet.

[19] See Truman, Radio Report to the American People on the Potsdam Conference (Aug. 9, 1945), Truman Papers, *supra*, at page 212, quoted in Nagan, *Nuclear Arsenals, International Lawyers, and the Challenge of the Millennium* (1999) 24 Yale J. Internat.L. 485, 535, fn. 43.

[20] Indeed, the commencement of a similar case in federal court has prompted one commentator to note that allowing domestic law claims by former American POWs threatens the good relations that the 1951 treaty was intended to promote. (See Van Deven, *Taking One for the Team: Principle of Treaty Adherence as a Social Imperative for Preserving Globalization and International Legal Legitimacy as Upheld in In re World War II Era Japanese Forced Labor Litigation* (2002) 46 St. Louis U. L.J. 1091, 1122–1123 ("Throughout the suit, many plaintiffs went on record as saying that they desired to have their day in court for purposes of revealing the details of wartime offenses committed against American soldiers in the Pacific. . . . The Japanese responded to these observations by exclaiming that these claims were a

### III. The Text of the 1951 Treaty

With that context as a backdrop, we now turn to the text of the treaty itself. The actual language of a treaty is, after all, the ultimately dispositive source of judicial decisionmaking. (E.g., *Chan v. Korean Air Lines, supra,* 490 U.S. at p. 134 ["We must thus be governed by the text . . . ."].)

Allied prisoners of war were the subject of Article 16 of the treaty. That provision states: "As an expression of its desire to indemnify those members of the armed forces of the Allied Powers who suffered undue hardships while prisoners of war of Japan, Japan will transfer its assets and those of its nationals in countries that were neutral during the war, or which were at war with any of the Allied Powers, or, at its option, the equivalent of such assets, to the International Committee of the Red Cross," which would "liquidate such assets and distribute the resultant fund to appropriate national agencies, for the benefit of former prisoners of war and their families on such basis as it may determine to be equitable." (Treaty of Peace with Japan, Sept. 8, 1951, 3 U.S.T. 3169, 3185 (Peace Treaty).) It was article 16 that created the fund from which, as Senator Hatch would later term them, "meager" payments to American POW's would be made.[21]

Article 14 covered the subject of Allied claims against Japan and is at the center of the current controversy. Article 14 begins by explicitly recognizing that Japan *couldn't* pay for all the damages and suffering it had caused: "It is recognized that Japan should pay reparations to the Allied Powers for the damage and suffering caused by it during the war. *Nevertheless it is also recognized that the resources of Japan are not presently sufficient, if it is to maintain a viable economy, to make complete reparation for all such damage and suffering* and at the same time meet its other obligations." (Peace Treaty, *supra,* 3 U.S.T. at p. 3180, italics added.)

The next paragraph, Article 14(b) contains the waiver language. Here is its complete text: "Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers *and their nationals* arising out of any actions taken by Japan *and its nationals* in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation." (Peace Treaty, *supra,* 3 U.S.T. at 3183, italics added.)

---

'form of extortion' and that if the United States desired to do so, the gloves essentially would come off. In an effort to combat the claims and show that America was not without guilt in the Second World War, Japanese officials voiced a desire to surface the questionable usage of atomic warfare in both Hiroshima and Nagasaki. Arguably, tensions would have soared had the World War II Case gone before a jury. [¶] Dulles feared that allowing such suits to prevail would hinder progressive international relations with Japan. These quotes made by Japanese officials demonstrate that the fears of Dulles came close to being true.") (Fns. omitted.)

[21] Senate Report, *supra,* at page 2 (statement of Chairman Hatch).

IV. Pow Claims Were Covered By the Treaty

### A. POW Claims Arose Because of Japan's "Prosecution" of the War

In light of the historical circumstances mentioned above, a number of the questions inherent in the text of Article 14(b) are readily resolved. The United States government was fully aware of the heinous treatment of American POW's; Truman had, in fact, justified the use of atomic weapons precisely because of that treatment. Recompensing the POW's would be ruinous to the Japanese economy, as recognized by Truman in his speech and by the Senate Foreign Relations Committee report, and impliedly in the first part of Article 14, which stressed the need to develop a viable Japanese economy. It logically follows that even allowing POW's to pursue private claims against the large Japanese companies who had exploited their labor would be ruinous as well. An economy dominated by these *zaibatsu* would suffer greatly if they could be subjected to such claims, particularly if litigated in American courts in front of American juries. These were large companies, dominating the Japanese economy. To allow claims against them would stifle whatever prospects there were for a prosperous Japan in the postwar world.

By the same means the argument that POW claims for forced labor did not arise in the course of the "prosecution" of the war effort is resolved as well. It may not have been. *legal* to force American POW's to do work for the Japanese war effort, but it surely created "other claims" which, if litigated and properly compensated in American courts, would have a devastating effect on the Japanese economy. It bears repeating in this regard that the plaintiffs were members of the American armed forces taken prisoner by the Japanese Army after Pearl Harbor during the war in the Pacific. All were forcibly held in POW camps maintained by the Japanese Army during the war. They could have done no work for any private person *except* as compelled to do so by the Japanese Army in wartime. When they tell the stories of their day-to-day existence in the Japanese POW camps, their days invariably began with being marched by the Japanese *Army* to some facility operated by a private company. And their work, as the federal district court noted when the *Kawakita* treason case was tried, "added many tons of nickel ore to Japan's war effort." (See *United States v. Kawakita, supra,* 96 F.Supp. at p. 837.) It is telling, in that regard, that the first named defendant in this case was part of the conglomerate that made the Zero (the name comes from "Mitsubishi Type 0"), Japan's main fighter plane.

Indeed, no other result would be consistent with the *Kawakita* treason case as it was finally decided by the United States Supreme Court in 1952. As mentioned above, Kawakita was an American who worked as an interpreter

in a private mine, namely the Oeyama Nickel Industry Co., Ltd. When he was prosecuted for treason, his main defense was that he had already renounced his citizenship by virtue of accepting employment for the company, which he claimed was the performance of duties "under the government" of Japan. (See *Kawakita v. United States, supra*, 343 U.S. at p. 727.)

The Supreme Court rejected that defense. Kawakita didn't work for the government. Though he took orders from the military, he wore an insignia showing that he was a civilian; he had no duties to perform toward the POW's except as an interpreter. The fact that the company was part of the Japanese "war economy" did not change his status from private to governmental. (*Kawakita v. United States, supra*, 343 U.S. at pp. 727–728.) Even so, the United States Supreme Court upheld Kawakita's *treason* conviction precisely *because* his conduct toward his fellow American citizens in the mines, even as a private employee of a Japanese company, still gave aid and comfort to the Japanese *war* effort.[22]

The overt acts which formed the basis of the conviction included incidents straight out of the complaints in the case before us. Kawakita regularly swore at the prisoners, beat them, threatened them, and punished them if they showed the least bit of tiredness. In one instance, he kicked an American POW when, after becoming ill and dizzy, he slowed down in lifting pieces of ore rocks from the tracks. In another, he struck a prisoner who was weak and emaciated to make him carry two buckets of lead instead of one. (*Kawakita v. United States, supra*, 343 U.S. at pp. 737–738.) In yet another, he ordered a POW to carry a heavy log up an ice-covered slope. When the prisoner fell, Kawakita delayed his removal back to the POW camp for five hours. (*Id.* at p. 740.) There were another five such instances of cruel treatment of American POW's as slave laborers.

The Supreme Court upheld the treason conviction because these were acts that "gave aid and comfort to the enemy." (*Kawakita v. United States, supra*, 343 U.S. at p. 741.) As the high court said, "They showed conduct which actually promoted the cause of the enemy. They were acts which tended to strengthen the enemy and advance its interests. These acts in their setting would help make all the prisoners fearful, docile, and subservient. . . . These acts would

---

[22] A reference in a law review article, Bazyler, *The Holocaust Restitution Movement in Comparative Perspective* (2002) 20 Cal. J.Internat.L. 11, 30, suggests *Kawakita* stands for the proposition that the Japanese companies for whom Kawakita worked were not part of the prosecution of the war. That suggestion is a misreading of the Supreme Court opinion. It is erroneous to draw the conclusion from the *Kawakita* court's rejection of the defendant's "private employment" defense that the Japanese companies exploiting slave labor weren't part of the "prosecution" of the war. They most certainly were. To conclude otherwise is to ignore the fact that Kawakita himself was still convicted of treason, *precisely because his work for a private company gave aid and comfort to the enemy during wartime.*

tend to give the enemy the 'heart and courage to go on with the war.' . . . All of the overt acts tended to strengthen Japan's war efforts; all of them encouraged the enemy and advanced its interests." (*Id.* at pp. 741–742.)[23]

■ If the maltreatment of American POW's by a civilian employee of a civilian company was sufficient aid and comfort to the Japanese during wartime that it constituted treason if committed by an American citizen, there can be no denying that the plaintiffs' claims here—which are, in a horrible sense, the same facts as the *Kawakita* case except viewed from the vantage of

---

[23] Interestingly enough, the question of where the conduct of the Japanese military left off and where that of private companies began was also the central concern of the British Military court that tried the executives of the Nippon Mining Company in 1947. One of the defenses asserted in that case was that the private company was acting under orders from the Japanese Army. (See Ramasastry, *Corporate Complicity: From Nuremberg to Rangoon: An Examination of Forced Labor Cases and Their Impact on the Liability of Multinational Corporations, supra,* 20 Cal. J.Internat.L. at p. 114 ["the British Military court focused a great deal of attention on whether care for the prisoners (and subsequent mistreatment) was the responsibility of the mining company or of the army. Similar to the German industrialists, the mining company officials invoked the defense of necessity. They asserted that in using POW labor in their mining operations, they were acting under orders from the Japanese Army."].) As was the case with American POWs, the typical pattern was that guards would march POWs to the entrance of a mine, where the prisoners would be handed over to civilians. (See *id.* at pp. 115–116.)

In this regard, we also, at plaintiffs' request, take judicial notice of the recent decision by the Fukuoka District Court on April 26, 2002, entitled *Jang Bao Heng v. Mitsui Mining, Inc.*, a case involving surviving Chinese prisoners of war. (We fully recognize the limitations of the report—it is the plaintiffs' translation of the decision, and it is of limited relevance to a case involving American prisoners of war in any event.) Even so, there is no reason to ignore the decision.

Much of the *Jang Bao Heng* opinion appears to be devoted to demonstrating that the claims of Chinese nationals against Japanese nationals were not renounced in the Sino-Japanese Joint Statement of 1972 and the 1978 Sino-Japanese treaty of friendship and peace and is thus technically irrelevant to the case before us here. The primary significance of the case to the plaintiffs are statements in its translated decision to the effect that "Defendant Country should not bear responsibility for compensation for injuries based on these (the mining companies') illegal acts" and "[I]t cannot be said that the workplace facilities, etc., were established under the control of, or that Plaintiffs' working conditions, etc. were managed, according to Defendant Country." The inference we are asked to draw is that the actions of these private companies should not be ascribed to the Japanese war effort. Not so. The court decision (at least the translation of it provided by plaintiffs' counsel) is very plain that the use of slave labor by Japanese countries during the war *was* part of the Japanese war effort. Consider these passages: From page 5 (making the point that the Chinese and POW slave laborers were released at the end of the war): "Depending on the method of administrative delivery, *for the purpose of making up for the labor shortage accompanying the prosecution of the war in the Pacific, Defendants collaborated* and, just as the Chinese laborers, including Plaintiffs, were forcibly taken away and forcibly made to work against their wishes, Japan was defeated and, *because the Japanese government signed the instrument of surrender on September 2, 1945, the aim of the forced taking away and forced labor in this case was extinguished.*" (Italics added.) And from page 6: "In this case, regarding the forced taking away and forced labor in this case, Defendant Country expected that it would be solved as war crimes case . . . ."

the American prisoners, not one of their tormentors—arose "in the course of the prosecution of the war" for purposes of the treaty.

Confirming our conclusion is what the Ninth Circuit noted in the *Deutsch* case. It noted that the California legislation under which the plaintiffs have brought this suit is framed strictly in terms of what happened during World War II. (See *Deutsch, supra*, 324 F.2d at p. 712.) And in fact the Ninth Circuit also noted there was really no dispute that the companies sued here were operating "for the benefit of our wartime enemy," i.e., Japan. (*Ibid.*)

■ The most natural reading of the "prosecution" is thus one which is not limited to merely lawful acts. Claims, after all, almost always arise out of unlawful or wrongful acts.

### B. The Difference In Language Between Article 14 and Article 19 Makes No Difference

Next there is the matter of the difference in language between Article 14 (where the Allies waived claims) and Article 19 (where the Japanese waived claims). As the plaintiffs correctly point out here, Article 19 *is* broader. Article 19(a) of the treaty provides: "Japan waives all claims of Japan and its nationals against the Allied Powers and their nationals arising out of the war or out of actions taken because of the existence of a state of war, and waives all claims arising from the presence, operations or actions of forces or authorities of any of the Allied Powers in Japanese territory prior to the coming into force of the present treaty."

Moreover, in explaining what is encompassed by the waiver provisions of the article's first paragraph, Article 19(b) makes an explicit reference to the claims of Japanese POWs. "The foregoing waiver includes any claims arising out of actions taken by any of the Allied Powers with respect to Japanese ships between September 1, 1939, and the coming into force of the present Treaty, as well as any claims and debts arising in respect to Japanese prisoners of war and civilian internees in the hands of the Allied Powers, but does not include Japanese claims specifically recognized in the laws of any Allied Power enacted since September 2, 1945." The plaintiffs lay heavy emphasis on the fact that Article 19 contains a specific reference to Japanese POW's whereas its counterpart, Article 14, doesn't contain a specific reference to Allied POW's.

It is an argument that has force, and is supported by the venerable legal principle that in specifically mentioning one thing you impliedly exclude another. (*Expressio unius est exclusio alterius.*)

On balance, however, it cannot carry the day in light of the text of Article 16, specifically dealing with Allied POW's, and the basic facts in the historical record we have already mentioned. The specific provisions for Allied prisoners of war in Article 16 of the treaty would lead one to the natural conclusion that the fund being set up in that article was intended to serve as the main source of compensation for them. Any doubt is removed in the Senate Foreign Relations Committee report and the clear expression of intent in Article 14(a) to protect the viability of the Japanese economy.

Remember that in 1951 there was no California statute yet limiting the value of American prisoner of war claims to just the value of their forced labor. To the degree that they had *existing* claims for battery, torture, and intentional infliction of emotional distress of the worst sort, those claims would easily justify punitive damages, and such punitive damages could have resulted in the bankruptcy of the Japanese companies involved.

We need only contemplate the enormity of the sacrifices of the plaintiffs in this case to recognize what would have happened if an American jury had one of the Japanese corporate defendants in front of it and was not limited to just the value of the forced labor. What had the Senate Foreign Relations Committee report said? Insistence on paying reparations "in any proportion commensurate" with those claims would *wreck* Japan's economy.

Thus *particularly* given how horribly the plaintiffs in this case were treated, it must be assumed that the United States government knew that *properly* compensating them would be economically impossible. The strong indicia of intent to protect the Japanese economy as expressed by the key players on the American side must necessarily carry more weight than the asymmetry between Articles 14 and 19, which, we must acknowledge, cuts the other way.

## C.   Article 26 Does Not Apply to Individual Claims

Plaintiffs further contend that Article 26, which can be described as the "most favored nation" clause, allows them to maintain their claims. Article 26 says: "Japan will be prepared to conclude with any State which signed or adhered to the United Nations Declaration of January 1, 1942, and which is at war with Japan, or with any State which previously formed a part of the territory of a State named in Article 23, which is not a signatory of the present Treaty, a bilateral Treaty of Peace on the same or substantially the same terms as are provided for in the present Treaty, but this obligation on the part of Japan will expire three years after the first coming into force of the present Treaty. Should Japan make a peace settlement or war claims settlement with any State granting that State greater advantages than those

provided by the present Treaty, those same advantages shall be extended to the parties to the present Treaty."

Preliminarily, we must note that the most favored nation argument based on Article 26 tacitly acknowledges that Article 14 would otherwise preclude the lawsuit. The most favored nation argument only makes sense if you first say that, yes, the United States didn't get as good a deal under the terms of the treaty as some other nation got outside the treaty.

The allegation is that because so many of its citizens had lost property when the Japanese invaded Dutch Indonesia, the government of the Netherlands would not have signed the peace treaty with Japan unless it got a side deal with Japan for some compensation to those citizens.[24] The side deal involved the government of Japan paying private Dutch citizens (Allied "nationals" under the terms of Article 14) about $10 million in reparations.

▮ The most favored nation argument fails because, by its terms, Article 26 creates no private rights. The key phrase is "those same advantages shall be extended to the *parties* to the present Treaty." Individual American citizens are not parties to the treaty, only the United States is. (See *Matta-Ballesteros v. Henman* (7th Cir. 1990) 896 F.2d 255, 259 [" 'it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress' "].) Thus even if we assume private Dutch citizens got compensation from the *Japanese government* where American POW's hadn't, it was the responsibility of the American government to enforce the article by making the Japanese government pay something to them. There is nothing in article 26 that makes it self-executing. Rather, it requires one of the "parties" to enforce it.

There are other fatal flaws in the most favored nation argument as well. Even if the United States were to obtain as favorable a side deal as the Dutch allegedly got, what would that be? Only direct reparations from the government of Japan, which is not the subject of this litigation. There is no indication that private Dutch citizens were allowed to sue private Japanese companies in Dutch court for loss of property.

### V. THERE IS EXPRESS CONFLICT BETWEEN CALIFORNIA'S LAW AND THE 1951 TREATY

The Ninth Circuit, in the *Deutsch* case, came to the same conclusion we come to now, but did so without examining the terms of the 1951 treaty. We

---

[24] See Clemons, *Recovering Japan's Wartime Past—and Ours*, New York Times, *supra*.

believe we have taken the more conservative course, because a *treaty* is as formal an expression of American foreign policy as it is possible to imagine. It is the product of both the federal executive and legislative branches. If a treaty does not allow a state to create (or entertain preexisting) claims on the part of POW's, then the matter is final. There can be no room, such as Justice Ginsburg found in her dissent in *Garamendi*, for state action because the federal policy was not clear enough.

The 1951 treaty *is* clear enough. Short of the clairvoyance which would explicitly predict in 1951 what the California Legislature would do in 1999, the treaty succinctly precludes the claims of American nationals against Japanese nationals arising out of the war.[25]

VI.   APPLICATION OF THE 1951 TREATY TO THE POW CLAIMS AGAINST JAPANESE NATIONALS IS CONSTITUTIONAL

Finally, there is the argument that *even if* the 1951 treaty did clearly preclude (or preempt, for purposes of our discussion now, the distinction is immaterial) the plaintiffs' lawsuit, it could not do so constitutionally. The theory behind the argument is that a treaty cannot diminish individual rights otherwise guaranteed by the Constitution, and the 1951 treaty has done so. Thus in their posttransfer briefing, the plaintiffs point to a footnote in *Garamendi* and argue that preemption is subject to "the Constitution's guarantees of individual rights," (see *Garamendi, supra*, 539 U.S. at p. 416, fn. 9 [123 S.Ct. at p. 2387]), implying that among their individual rights is the right to sue Japanese companies for wartime forced labor. In supplemental briefing the plaintiffs are even plainer: The treaty should not be read to "take away from private American citizens their preexisting right to sue private Japanese interests for the deprivations perpetrated on them . . . during the War years."[26]

Essentially, what the plaintiffs are saying is that the United States government cannot constitutionally take away the right of American *nationals* to sue Japanese *nationals* for claims arising out of World War II. Perhaps plaintiffs believe that the federal government can surrender its own claims against foreign nationals, but they do not believe that it can surrender the claims of its nationals against foreign nationals. Senator Hatch also said as much in the

[25] The treaty is a remarkably short document, and any such provision would be contrary to the general spirit of its drafting, which expresses its terms with an economy of words.

[26] The reference to *preexisting* rights is an overstatement. The statute of limitations on the plaintiffs' common law tort claims ran long ago. They are able to sue only because the Legislature created a new right to sue. (See also our mention in footnote 2 that we do not deal with the due process implications of taking a cause of action long dead and reviving it by special legislation.)

hearings before the United States Senate Judiciary Committee on the POW claims (referenced in fn. 5, *ante*).[27]

We do not, in this opinion, address the question of any claims other than the ones these specific plaintiffs have against Japanese nationals, claims which arise out of their being taken prisoners of war in World War II. But as to those claims, the argument that a peace treaty could not prevent their assertion in a *state* court is clearly untenable.

If there is one thing that the United States Constitution is clear about, it is that only the federal government has the power to make war and peace with foreign nations, and that power specifically includes the authority to make peace treaties. Specifically:

Article I, section 8: "The Congress shall have Power To . . . provide for the common Defense . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations; To declare War, . . . and make Rules concerning Captures on Land and Water."

Article I, section 10: "No State shall enter into any Treaty, Alliance, or Confederation. . . . No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with . . . a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."

Article II, section 2: the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties."

Article VI: "[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The power to make war and then conclude it with a peace treaty is an undeniable incident of the very fact of having a national government. The United States Supreme Court once went so far as to say that even if the Constitution had not explicitly committed those powers exclusively to the

---

[27] During the testimony of Ronald J. Bettauer, a deputy legal adviser at the State Department, Senator Hatch asked, "But how can the Government waive the rights of individuals?" After Bettauer answered that he would "talk a little bit about how this occurred," Senator Hatch elaborated: "I shouldn't have interrupted you. I can see how the Government can waive its rights. I can see how it can enter into a treaty. I can see how it can do all of that. But what bothers me is how can it, without the consent of the individual citizens, waive the rights of individual citizens who have been mistreated." (Sen. Rep., *supra*, at p. 10.)

federal government, those powers would be exclusive to the federal government anyway: "The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality." (*United States v. Curtiss-Wright Export Corp.* (1936) 299 U.S. 304, 318 [81 L.Ed. 255, 57 S.Ct. 216].)

██ It is therefore inescapable that the claims of American nationals arising out of duly declared war against foreign nationals as part of the prosecution of that war may be constitutionally compromised in a peace treaty. It is the nature of war, after all, for the combatants to do things that, in peace time, would otherwise constitute torts in most legal systems. If the United States government did not have the constitutional power to resolve claims *arising out of war* by American citizens against foreign nationals, then it would not have the power to conclude a genuine peace treaty. A state legislature could elect to keep on fighting a war indefinitely by allowing its courts to be used to civilly prosecute enemy combatants, particularly if it did not like the deal that the federal government made in the peace treaty. (Cf. *Garamendi, supra,* 539 U.S. at p. 427 [123 S.Ct. at p. 2393] ["The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves."].) And that would be totally inconsistent with the Constitution of the United States. California is not allowed to have its own foreign policy.

If there be any doubt concerning our analysis, it is dispelled by the *Garamendi* decision itself. *Garamendi,* as mentioned above, arose out of California legislation imposing certain requirements, specifically *disclosure* requirements, on German insurance companies that had issued policies to victims of the Holocaust. The majority opinion noted that these disclosure requirements were "far more" sweeping than the arrangements worked out by the federal executive via an international commission to process those claims. (See *Garamendi, supra,* 539 U.S. at p. 423 [123 S.Ct. at p. 2391].)

It is thus important to note that *Garamendi,* like the case before us, involved private claims by Americans against foreign companies—national versus national claims. In a major passage in the opinion, the *Garamendi* majority made it quite clear that such claims *arising out of war* can be constitutionally compromised by the federal government, despite state law to the contrary. That passage bears quotation here, our italics added:

"The executive agreements at issue here do differ in one respect from those just mentioned insofar as they address claims associated with formerly belligerent states, *but against corporations, not foreign governments.* But the distinction does not matter. Historically, wartime claims against even nominally private entities have become issues in international diplomacy, and three

of the postwar settlements dealing with reparations implicating private parties were made by the Executive alone. Acceptance of this historical practice is supported by a good pragmatic reason for depending on executive agreements *to settle claims against foreign corporations associated with wartime experience*. As shown by the history of insurance confiscation mentioned earlier, untangling government policy from private initiative during war time is often so hard that diplomatic action *settling claims against private parties* may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments. While a sharp line between public and private acts works for many purposes in the domestic law, insisting on the same line in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies." (*Garamendi, supra*, 539 U.S. at p. 415–416 [123 S.Ct. at p. 2387], fn. omitted.)

Not surprisingly then, the court would go on to declare that "securing private interests is an express object of diplomacy today," and "[v]indicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding . . . ." (*Garamendi, supra*, 539 U.S. at p. 421 [123 S.Ct. at p. 2390].)

If, in *Garamendi*, the high court would see no constitutional impediment to the *federal executive's* efforts to compromise property claims of civilian Holocaust victims, then a fortiori there can be no constitutional impediment where a *treaty* (not just the unilateral efforts of one administration) compromises claims of American combatants for actions taken against those combatants as prisoners of war by a foreign government and its nationals during time of war as part of the foreign government's overall war effort.

## VII. CONCLUSION

The United States Constitution directly binds state court judges where treaties are concerned. The 1951 treaty is express in not allowing the claims of the plaintiffs. That does not in any way diminish the heroism of these plaintiffs. It does mean, though, that we cannot provide any satisfaction of their claims in California state courts.

We are therefore required to let a peremptory writ issue commanding the Superior Court to vacate its orders overruling the demurrers and denying the motions for judgment on the pleadings in these cases, and enter a new and different order dismissing the cases.

In the interests of justice each side will bear its own costs.

Rylaarsdam, J., and O'Leary, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied February 24, 2004.