[No. B155736. Second Dist., Div. Eight. Mar. 30, 2004.]

TAIHEIYO CEMENT CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JAE WON JEONG, Real Party in Interest.

**COUNSEL**

Bingham Dana, Bingham McCutchen, Matthew E. Digby, Heidi A. Leider; Masuda & Ejiri, Junji Masuda; Loeb & Loeb, Douglas E. Mirell, Joseph Geisman; Greines, Martin, Stein & Richland, Martin Stein, Robin Meadow and Laura Boudreau for Petitioners Taiheiyo Cement Corporation, Taiheiyo Cement U.S.A., Inc., California Portland Cement Company and Glacier Northwest, Inc.

O'Melveny & Myers, John F. Niblock; McCutchen, Doyle, Brown & Enersen, David M. Balabanian; Morrison & Foerster, Lloyd Aubry, Arne D. Wagner; Pillsbury Winthrop, Barbara Croutch; Bingham Dana, Bingham McCutchen, Matthew Digby; Sullivan & Cromwell and Robert A. Sacks for Mitsubishi Materials Corp., Mitsubishi Materials U.S.A. Corp., Mitsui & Co., Ltd., Mitsui & Co. (U.S.A.), Inc., Mitsubishi International Corp., Ishikawa-jima Harima Heavy Industries Co., Ltd., IHI, Inc., Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., Mitsui Mining Co., Ltd., Mitsui Mining U.S.A., Inc., Nippon Steel Corporation, Nippon Steel U.S.A., Inc., Nippon Steel Trading Co., Ltd., and Nippon Steel Trading America, Inc., as Amici Curiae on behalf of Petitioners.

Debra W. Yang and John S. Gordon, United States Attorneys; Peter D. Keisler and Robert D. McCallum, Jr., Assistant Attorneys General; James G. Hergen, Lara A. Ballard; Mark Stern, Douglas Hallward-Driemeier, Eric Miller and Kathleen Kane for the United States of America as Amicus Curiae on behalf of Petitioners.

Fleishman & Fisher, Barry A. Fisher, David Grosz; Lieff, Cabraser, Heimann & Bernstein, Elizabeth J. Cabraser, Bill Lann Lee, Morris A. Ratner, Scott P. Nealy; Blumenthal & Markham, David R. Markham; Law Offices of Haewon Shin, Haewon Shin; Cohen, Milstein, Hausfeld & Toll, Michael D. Hausfeld, Agnieszka M. Fryszman; Kenneth T. Haan & Associates, Kenneth T. Haan; and Lim, Ruger & Kim, Christopher Kim and Lisa J. Yang for Real Party in Interest.

Strumwasser & Woocher, Fredric D. Woocher; Jack Goldsmith and Erwin Chemerinsky for the Chinese American Citizens Alliance, the Korean-American Federation of Los Angeles, the Korean American Coalition, and the Korean American Chamber of Commerce of Los Angeles as Amici Curiae on behalf of Real Party in Interest.

Schonbrun, DeSimone, Seplow, Harris & Hoffman and Paul L. Hoffman for the Honorable John L. Burton, Herbert J. Wesson, Jr., Tom Hayden, Adam B. Schiff, Gil Cedillo, Wilma Chan, Dr. Judy Chu, Mike Honda, Carol Liu and George Nakano as Amici Curiae on behalf of Real Party in Interest.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Angela Sierra, Phyllis Cheng and Catherine Z. Ysrael, Deputy Attorneys General, for Attorney General Bill Lockyer as Amicus Curiae on behalf of Real Party in Interest.

OPINION

BOLAND, J.—

## INTRODUCTION

Code of Civil Procedure section 354.6[1] allows certain individuals who were "slave labor" or "forced labor" victims during World War II (WWII) to recover compensation for unpaid labor and personal injuries suffered at the hands of "the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers." (§ 354.6, subd. (a)(1) & (2).) On January 15, 2003, we decided section 354.6 was constitutional because the lawsuits authorized by the statute did not impermissibly infringe upon the federal government's exclusive power over foreign affairs, and because the Treaty of Peace with Japan that formally ended WWII between the United States and Japan (1951 Treaty) did not demonstrate a clear intent to bar the wartime claims of Korean nationals.

The California Supreme Court granted review and transferred this case back to us with instructions to vacate our opinion and reconsider it in light of *American Ins. Ass'n v. Garamendi* (2003) 539 U.S. 396 [156 L.Ed.2d 376, 123 S.Ct. 2374] (*Garamendi*), decided by the United States Supreme Court on June 23, 2003. *Garamendi* held California's Holocaust Victim Insurance Relief Act (HVIRA) was unconstitutional because it conflicted with certain executive agreements negotiated by the President with several European leaders. The executive agreements sought, among other things, to encourage European insurers to provide information about unpaid insurance policies issued to Holocaust victims and the settlement of claims brought under them. (*Id.* at pp. 403–409 [123 S.Ct. at pp. 2381–2383].) The Court held HVIRA's requirement that insurers publicly disclose information concerning Holocaust-era policies conflicted with, and thus was preempted by, the President's foreign policy embodied in the agreements that such information and claims be resolved voluntarily rather than through a state system of economic compulsion. (*Id.* at pp. 422–427 [123 S.Ct. at pp. 2391–2393].)

█ In light of *Garamendi*, we vacate our prior opinion and hold section 354.6 is unconstitutional because it conflicts with the federal policy embodied in the 1951 Treaty. While the 1951 Treaty does not expressly preempt Jeong's claims under section 354.6, it embodies the federal government's foreign policy that claims against Japan and its nationals are to be resolved diplomatically. By encouraging coercive litigation of claims against Japanese nationals, section 354.6 conflicts with the federal policy of diplomacy embodied in the treaty.

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

## FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Jae Won Jeong sued to recover compensation for unpaid labor and personal injuries suffered while enslaved in a labor camp during WWII. Jeong, who is now a United States citizen and a California resident, claims he was a Korean national during WWII. Refusing to join the Japanese military, Jeong was taken to a slave labor camp in Korea operated by a Japanese cement company. Along with other Korean nationals, Jeong was subjected to physical and mental torture and forced to perform hard physical labor without compensation, all to benefit the Japanese war effort.[2]

Onoda Cement Co., Ltd., is the Japanese entity that operated the company where Jeong was forced to work. Jeong sued Onoda, Taiheiyo Cement Corporation (the Japanese entity that succeeded Onoda by merger), and three of Taiheiyo's subsidiaries, all of which are referred to as Taiheiyo.[3] Jeong alleged causes of action for (1) compensation under section 354.6, (2) unjust enrichment, (3) injuries in tort, including battery, intentional infliction of emotional distress, and unlawful imprisonment, and (4) unfair business practices under Business and Professions Code section 17200 et seq.

Taiheiyo moved for judgment on the pleadings contending, among other grounds, the 1951 Treaty preempted Jeong's claims under section 354.6. In a subsequent motion for judgment on the pleadings, Taiheiyo argued section 354.6 was unconstitutional under *Zschernig v. Miller* (1968) 389 U.S. 429 [19 L.Ed.2d 683, 88 S.Ct. 664] (*Zschernig*) because it interfered with the federal government's exclusive power over foreign affairs, and it violated due process.[4] The trial court denied both motions.

Taiheiyo filed a petition for writ of mandate challenging the trial court's ruling. We denied the petition, deciding the 1951 Treaty did not preempt Jeong's claims under section 354.6 and the statute was constitutional under *Zschernig*'s foreign affairs doctrine. As we will discuss, we have reconsidered this case in light of *Garamendi*, which compels us to conclude section 354.6 is unconstitutional.

---

[2] Jeong alleges he represents a class of plaintiffs in the United States who were forced to perform labor for the defendants between 1929 and 1945. A class has not been certified.

[3] The Taiheiyo subsidiaries are (1) Taiheiyo Cement U.S.A., (2) California Portland Cement Company, and (3) Lone Star Northwest, Inc. Each subsidiary is alleged as a California corporation. Lone Star is now known as Glacier Northwest, Inc., a Washington corporation.

[4] Under *Zschernig's* dormant foreign affairs preemption doctrine, "state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict." (*Garamendi, supra,* 539 U.S. at p. 417 [123 S.Ct. at p. 2388].)

## DISCUSSION

A. *Section 354.6 Permits Actions for World War II Claims.*

Enacted as an emergency measure in 1999 (Sen. Bill No. 1245 (1999–2000 Reg. Sess.)), section 354.6 allows any WWII "slave labor victim" or "forced labor victim," or their heirs, to "bring an action to recover compensation for labor performed as a . . . slave labor victim or . . . forced labor victim from any entity or successor in interest thereof, for whom that labor was performed, either directly or through a subsidiary or affiliate." (§ 354.6, subd. (b).)[5] The statute provides that California courts have jurisdiction over such lawsuits and that "[a]ny action brought under this section shall not be dismissed for failure to comply with the applicable statute of limitations, if the action is commenced on or before December 31, 2010." (§ 354.6, subds. (b) & (c).)

The Legislature clarified that section 354.6 was enacted because "[t]housands of victims of Nazi persecution, and the heirs of victims of Nazi persecution, are residents of the State of California. [¶] (b) These victims of Nazi persecution have been deprived of their entitlement to compensation for their labor and for injuries sustained while performing that labor as forced or slave laborers prior to and during the Second World War. [¶] (c) California has a moral and public policy interest in assuring that its residents and citizens are given a reasonable opportunity to claim their entitlement to compensation for forced or slave labor performed prior to and during the Second World War. [¶] (d) To the extent that the statute of limitations applicable to claims for compensation is extended by this act, that extension of the limitations period is intended to be applied retroactively, irrespective of whether the claims were otherwise barred by any applicable statute of limitations under any other provision of law prior to the enactment of this act." (Sen. Bill No. 1245 (1999–2000 Reg. Sess.) § 1, subds. (a)–(d).)

---

[5] A WWII "slave labor victim" is defined as "any person taken from a concentration camp or ghetto or diverted from transportation to a concentration camp or from a ghetto to perform labor without pay for any period of time between 1929 and 1945, by the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers." (§ 354.6, subd. (a)(1).)

A WWII "forced labor victim" is defined as "any person who was a member of the civilian population conquered by the Nazi regime, its allies or sympathizers, or prisoner-of-war of the Nazi regime, its allies or sympathizers, forced to perform labor without pay for any period of time between 1929 and 1945, by the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers." (§ 354.6, subd. (a)(2).)

"Compensation" means "the present value of wages and benefits that individuals should have been paid and damages for injuries sustained in connection with the labor performed. Present value shall be calculated on the basis of the market value of the services at the time they were performed, plus interest from the time the services were performed, compounded annually to date of full payment without diminution for wartime or postwar currency devaluation." (§ 354.6, subd. (a)(3).)

■ In short, section 354.6 permits actions for unpaid labor and personal injuries by persons subjected to slave or forced labor during WWII by the Nazis, their allies and sympathizers. It allows victims to sue the entities that enslaved them, or any successor in interest or affiliate of those entities.

## B. *Garamendi's "Conflict" Theory of Foreign Affairs Preemption.*

Because *Garamendi* forms the basis for our conclusion in this case, it is important to describe its salient facts and rationale. HVIRA required insurers doing business in California to disclose details of insurance policies issued by the insurer, or related companies, to persons in Europe between 1920 and 1945. (Ins. Code, §§ 13800–13807.) Those details included the status of each policy, the city of origin, the domicile or address of each policyholder, and the names of beneficiaries. (Ins. Code, § 13804, subd. (b).) If the insurer failed to provide the disclosures, it lost its license to do business in the state. (Ins. Code, § 13806.)

As noted by the statute, the California Legislature said that "[i]n addition to the many atrocities that befell the victims of the Nazi regime, insurance claims that rightfully should have been paid out to the victims and their families, in many cases, were not," and thus the law was "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." (Ins. Code, § 13801, subds. (b) & (f).) The law also was intended to enhance enforcement of section 354.5, a statute enacted along with HVIRA that allowed lawsuits in California courts on insurance claims based on acts perpetrated during the Holocaust, and extended the statute of limitations on such actions to 2010. (Ins. Code, § 13801, subd. (e); *Garamendi, supra,* 539 U.S. at p. 409 [123 S.Ct. at p. 2384].)

The Ninth Circuit concluded HVRIA did not invade the federal government's exclusive role over foreign affairs (*Gerling Global Reinsurance Corp. of America v. Low* (9th Cir. 2001) 240 F.3d 739, 753), but a majority of the United States Supreme Court, in a five-to-four decision, disagreed (*Garamendi, supra,* 539 U.S. at p. 411 [123 S.Ct. at p. 2385]). The critical issue before the Court was whether certain executive agreements negotiated by the President of the United States with the leaders of Germany and Austria presented a sufficiently clear expression of federal foreign policy so as to conflict with and therefore preempt the California law. (*Id.* at pp. 415–417 [123 S.Ct. at pp. 2387–2388].) The executive agreements sought, among other things, to encourage European insurers to provide information about unpaid insurance policies issued to Holocaust victims and the settlement of claims brought under them as an alternative to protracted litigation. (*Id.* at pp. 403–408 [123 S.Ct. at pp. 2381–2383].)

The court reaffirmed the principle that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy" and that " 'the President's control of foreign relations includes the settlement of claims . . . .' " (*Garamendi, supra*, 539 U.S. at pp. 413–416 [123 S.Ct. at pp. 2386–2387].) The court further acknowledged that the executive agreements did not include a preemption clause and thus could not expressly preempt the California law. Nonetheless, the court held the foreign policy embodied in the agreements—disclosure and settlement through diplomacy rather than litigation—was sufficiently in conflict with HVIRA to require its preemption. (*Id.* at pp. 415–421 [123 S.Ct. at pp. 2387–2390].) The court concluded:

"[T]he consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions. [Citations.] As for insurance claims in particular, the national position, expressed unmistakably in the executive agreements signed by the President with Germany and Austria, has been to encourage European insurers to work with the ICHEIC [International Commission on Holocaust Era Insurance Claims, a voluntary international organization of insurers] to develop acceptable claim procedures, including procedures governing disclosure of policy information. . . . (Citations omitted.)

"California has taken a different tack of providing regulatory sanctions to compel disclosure and payment, supplemented by a new cause of action for Holocaust survivors if the other sanctions should fail. . . . HVIRA's economic compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, employs 'a different, state system of economic pressure,' and in doing so undercuts the President's diplomatic discretion and the choice he has made exercising it. [Citation.] Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding 'the coercive power of the national economy' as a tool of diplomacy, [citation], HVIRA denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own policies on disclosure. . . . [¶] . . . [¶]

"The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves. We have heard powerful arguments that the iron fist would work better, and it may be that if the matter of compensation were considered in isolation from all other issues involving the European allies, the iron fist would be the preferable policy. But our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress. The question relevant to preemption in this case is conflict, and the evidence here is 'more than sufficient to demonstrate that

[HVIRA] stands in the way of [the President's] diplomatic objectives.' [Citation.]" (*Garamendi, supra*, 539 U.S. at pp. 420–428 [123 S.Ct. at pp. 2390–2393].)

Thus, under *Garamendi*'s "conflict" theory of foreign affairs preemption, the focus is not upon whether the federal law expressly precludes or even mentions the state action involved. The critical inquiry is whether the federal expression of foreign policy conflicts with the state law. Despite the fact the executive agreements did not demonstrate an intent to occupy the field of Holocaust insurance information disclosure and claims, and according to the dissent did not even mention the issue of disclosure (*Garamendi, supra*, 539 U.S. at p. 437 [123 S.Ct. at p. 2399] (dis. opn. of Ginsburg, J.)), the Supreme Court found foreign affairs preemption based solely on HVIRA's conflict with the foreign policy embodied in the agreements. The Court said, "The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two." (*Id.* at p. 420 [123 S.Ct. at p. 2390].)

## C. *The 1951 Treaty Preempts Section 354.6.*

Taiheiyo and the United States as amicus curiae contend section 354.6 conflicts with the federal policy embodied in the 1951 Treaty favoring diplomatic resolution of WWII-related claims, including the forced or slave labor claims of Korean nationals against Japanese corporations, like those alleged by Jeong. In light of *Garamdendi*, we agree.

### 1. *The 1951 Treaty Embodies Federal Foreign Policy.*

The 1951 Treaty "was signed at San Francisco . . . by the representatives of the United States and 47 other Allied powers and Japan. [Citation.] President Truman, with the advice and consent of the Senate, ratified the treaty and it became effective April 28, 1952. [Citation.] [¶] . . . [T]he salient features of the agreement are: (1) a grant of authority of Allied powers to seize Japanese property within their jurisdiction at the time of the treaty's effective date; (2) an obligation of Japan to assist in the rebuilding of territory occupied by Japanese forces during the war[,] and (3) waiver of all 'other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war . . . .' [Citation.]" (*In re World War II Era Japanese Forced Labor Litigation* (N.D.Cal. 2000) 114 F.Supp.2d 939, 944–945, italics omitted.)

One of the purposes behind the 1951 Treaty was to spare the Japanese economy from heavy reparations and welcome it into the company of Allied nations despite the events that occurred during WWII. (See *Mitsubishi Materials Corp. v. Superior Court* (2003) 113 Cal.App.4th 55, 66–67 [6

Cal.Rptr.3d 159] (*Mitsubishi*).) Article 14 of the 1951 Treaty, which addressed the subject of Allied claims against Japan, explicitly recognized Japan could not pay for all the damages and suffering it had inflicted: "It is recognized that Japan should pay reparations to the Allied Powers for the damage and suffering caused by it during the war. Nevertheless it is also recognized that the resources of Japan are not presently sufficient, if is to maintain a viable economy, to make complete reparation for all such damage and suffering and at the same time meet its other obligations." (1951 Treaty, Sept. 8, 1951, art. 14(a), 3 U.S.T. 3169, 3180, T.I.A.S. No. 2490.) As one court has phrased it, "Without a waiver of all war crime claims that could have been brought by either side, Japan and the United States might have wrangled endlessly about liabilities arising out of the war." (*Mitsubishi, supra*, 113 Cal.App.4th at p. 68.)[6]

As a result, the next paragraph, article 14(b), expressly waived all Allied claims against Japan and its nationals: "(b) Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation." (1951 Treaty, *supra*, art. 14(b), 3 U.S.T. at p. 3183.) Among the claims waived by this provision were those of American prisoners of war (POWs) who were enslaved during WWII and forced to perform uncompensated labor for the Japanese war effort. (See *Mitsubishi, supra*, 113 Cal.App.4th at pp. 70–73.)

Korea was not a signatory to the 1951 Treaty because, as part of the Empire of Japan until the end of WWII, it had not been at war with Japan. (See *In re: World War II Era Japanese Forced Labor Litigation* (N.D.Cal. 2001) 164 F.Supp.2d 1160, 1167–1168.) Thus, article 14's waiver provision did not specifically apply to Korean claims. Nonetheless, article 4(a) addresses the handling of such claims: "[T]he disposition of property of Japan and of its nationals . . . and their claims, including debts, against [Korea] . . . , and the disposition in Japan of property of [Korean] authorities and residents, and of claims, including debts, of [Korean] authorities and residents against

---

[6] Potential Allied claims against Japan amounted to more than $100 billion in 1952 dollars. (Japanese Peace Treaty and Other Treaties Relating to Security in the Pacific, Sen.Exec.Rep. No. 2, 82d Cong., 2d Sess. (1952) p. 13.) According to the U.S. Senate Foreign Relations Committee reviewing the 1951 Treaty, "Obviously insistence upon the payment of reparations in any proportion commensurate with the claims of the injured countries and their nationals would wreck Japan's economy, dissipate any credit that it may possess at present, destroy the initiative of its people, and create misery and chaos in which the seeds of discontent and communism would flourish. In short, insistence upon the payment of claims for reparations in any substantial amount would be contrary to the basic purposes and policy of the free nations, the Allied Powers, and the United States in particular." (*Id.* at p. 12.)

Japan and its nationals, shall be the subject of special arrangements between Japan and such authorities. . . . (The term nationals . . . includes juridical persons.)" (1951 Treaty, *supra*, art. 4(a), 3 U.S.T. at p. 3173.)[7] Similarly, with respect to other non-signatory nations, article 26 provides: "Japan will be prepared to conclude with any State . . . which is not a signatory of the present Treaty, a bilateral Treaty of Peace on the same or substantially the same terms as are provided for in the present Treaty." (*Id.* at p. 3190.) In other words, articles 4(a) and 26 indicated the claims of nonsignatory nations were to be negotiated separately by the government of Japan with the governments of those nations.

In our original opinion in this case, we concluded the 1951 Treaty did not preempt section 354.6 because Articles 4(a) and 26 did not evidence a sufficiently clear intent to foreclose claims by individuals of nonsignatory nations against Japanese nationals, like those alleged by Jeong against Taiheiyo. Our view was similar to the one expressed by Justice Ginsburg in *Garamendi* on behalf of the dissenting justices. Justice Ginsburg, along with Justices Stevens, Scalia and Thomas, would have upheld HVIRA because the President's executive agreements did not contain a formal expression of foreign policy disapproving state disclosure laws like HVIRA and did not expressly extinguish any underlying claims for relief. (*Garamendi, supra*, 539 U.S. at pp. 430–442 [123 S.Ct. at pp. 2395–2401] (dis. opn. of Ginsburg, J.).) For the majority of the Court, however, it was sufficient for preemption purposes that the executive agreements embodied the federal purpose and foreign policy of dealing with Holocaust insurance claims through diplomacy, and that this foreign policy conflicted with HVIRA's "regulatory sanctions to compel disclosure and payment." (*Id.* at pp. 2390–2392.)

■ We must therefore agree with Taiheiyo and the United States that similar to the executive agreements in *Garamendi*, Articles 4(a) and 26 embody the federal purpose and foreign policy that WWII claims by individuals of nonsignatory nations were to be resolved through diplomacy. Article 4(a) expresses the federal policy that claims by Korean nationals against Japanese nationals were to be "the subject of special arrangements" between the Korean and Japanese governments. While neither Japan nor Korea was required to implement any specific resolution, and Korea was under no obligation to even negotiate with Japan concerning the settlement of war claims, the treaty nonetheless expressed the foreign policy determination

---

[7] In return, article 21 gave Korea the benefits of Articles 2, 4, 9 and 12, which dealt with the recognition of Korean independence, the right of Korean authorities to seize all Japanese-owned assets in Korea, and the right of Korea to obtain certain economic agreements on a most-favored-nation basis, as well as other commercial rights. (1951 Treaty, *supra*, 3 U.S.T. at pp. 3172–3174, 3177–3179.)

of the Allied Powers, including the United States, that such claims should be resolved diplomatically between the Japanese and Korean governments.[8]

■ Indeed, *Garamendi*'s conclusion that the President's agreements embodied his foreign policy is far more compelling in this case. After all, rather than unilateral presidential agreements, we are dealing with federal policy expressed through a ratified treaty, the ultimate formal expression of the federal executive and legislative branches in matters of foreign policy. (See U.S. Const., art. VI [treaties made "under the Authority of the United States, shall be the supreme Law of the Land," thus overriding any conflicting state law]; see *Mitsubishi, supra,* 113 Cal.App.4th at pp. 61 & 75–76; see also *Missouri v. Holland* (1920) 252 U.S. 416, 432 [64 L.Ed. 641, 40 S.Ct. 382, 18 OhioL.Rep. 61]; *United States v. Belmont* (1937) 301 U.S. 324 [81 L.Ed. 1134, 57 S.Ct. 758]; *Zicherman v. Korean Air Lines Co.* (1996) 516 U.S. 217, 226 [133 L.Ed.2d 596, 116 S.Ct. 629].)

Recently, one federal court also concluded the 1951 Treaty expressed the federal government's foreign policy regarding the diplomatic resolution of claims by individuals of non-signatory nations. In rejecting damage claims by WWII "comfort women" against the government of Japan, the D.C. Circuit stated:

"[T]he 1951 Treaty . . . between Japan and the Allied Powers created a settled expectation on the part of Japan that it would not be sued in the courts of the United States for actions it took during the prosecution of [WWII], and the Congress has done nothing . . . to upset that expectation. . . .

". . . [T]he Treaty 'embodies the foreign policy determination of the United States that all claims against Japan arising out of its prosecution of [WWII] are to be resolved through intergovernmental settlements.' . . .

". . . The Treaty further provides that Japan would resolve the war-related claims of other United Nations member states and their nationals 'on the

---

[8] In June 1965, pursuant to article 4(a), Japan and South Korea did indeed enter into an agreement concerning war claims. (See Agreement on the Settlement of Problems Concerning Property and Claims and on the Economic Co-operation Between Japan and the Republic of Korea, June 22, 1965, 8473 U.N.T.S. 258, 260.) Likewise, China entered into war claims agreements with Japan in 1952 and 1978. (See Treaty of Peace Between the Republic of China and Japan, April 28, 1952, 138 U.N.T.S. 3, 38; Treaty of Peace and Friendship Between Japan and the People's Republic of China, Aug. 12, 1978, 1225 U.N.T.S. 257, 269.) As to North Korea, the negotiations contemplated by article 4(a) remain unresolved and are ongoing. In expressing its views to the United States regarding the effect of section 354.6, the government of Japan indicated in November 2000 that it has "conducted normalization talks with North Korea eight times from 1991 to 1992 and already three times after the resumption of the negotiations in April 2000." (Embassy of Japan, letter to U.S. Dept. of State (Nov. 17, 2000), The Views of the Government of Japan on the Lawsuits against Japanese Companies by the Nationals of the Countries not being a Party to the San Francisco Peace Treaty.)

same or substantially the same terms,' that is, through intergovernmental agreements . . . . As a result, Japan could not have expected to be sued in a court of the Unites States by either an Allied national or a Chinese or Korean national for a claim arising out of [WWII] because the Allied Powers had respectively waived the claims of their nationals and expressed a clear policy resolving the claims of other nationals through government-to-government negotiation. As a matter of foreign policy it would be odd indeed for the United States, on the one hand, to waive all claims of its nationals against Japan and, on the other hand, to allow non-nationals to proceed against Japan in its courts." (*Hwang Geum Joo v. Japan* (D.C. Cir. 2003) 332 F.3d 679, 681, 684–685, 357 U.S. App. D.C. 26.)

### 2. *The 1951 Treaty Conflicts with Section 354.6.*

■ We must further agree with Taiheiyo and the United States that the 1951 Treaty's expression of foreign policy sufficiently conflicts with section 354.6 so as to require its preemption. In our original opinion, we concluded section 354.6 did not create a new cause of action but was a proper procedural statute intended to retroactively extend the applicable statute of limitations for preexisting WWII slave and forced labor claims. At least two appellate courts have, in contrast, determined section 354.6 is not procedural, but creates new claims that otherwise would not exist. (See *Mitsubishi, supra,* 113 Cal.App.4th at p. 59; *Deutsch v. Turner Corp.* (9th Cir. 2003) 324 F.3d 692, 707 (*Deutsch*), cert. den. (2003) 540 U.S. 820 [157 L.Ed.2d 39, 124 S.Ct. 105].)[9] But whether viewed as procedural or substantive, it is inescapable that section 354.6 is a special rule authorizing WWII slave and forced labor victims to sue and recover damages in California courts as a result of their enslavement during the war, a rule that conflicts with the 1951 Treaty's expression of federal policy that such war-related claims should be resolved diplomatically.

Just as the executive agreements in *Garamendi* established the federal executive's foreign policy of voluntary disclosure and payment "in preference

---

[9] *Deutsch,* decided six days after we issued our original opinion in this case, concluded section 354.6 was unconstitutional "because it intrudes on the federal government's exclusive power to make and resolve war, including the procedure for resolving war claims." (*Deutsch, supra,* 324 F.3d at p. 712.) The court focused on the fact that the United States had already exercised its own exclusive authority to resolve the war, including claims arising out of it, and chose not to incorporate into that resolution a private right of action against our wartime enemies or their nationals. (*Id.* at pp. 712–713.) The court said, "Section 354.6 runs afoul of the restriction on the exercise of foreign affairs powers by the states. Because California lacks the power to create a right of action—or, alternatively, to resurrect time-barred claims—in order to provide its own remedy for war-related injuries inflicted by our former enemies and those who operated in their territories, we hold that section 354.6 is unconstitutional." (*Deutsch, supra,* 324 F.3d at p. 716.)

to litigation or coercive sanctions" (*Garamendi, supra,* 539 U.S. at p. 420 [123 S.Ct. at p. 2390]), article 4(a) expresses the federal government's foreign policy determination that claims by Korean nationals, like Jeong's, should be resolved diplomatically by the governments of Korea and Japan. Likewise, just as HVIRA's regulatory sanctions compelling disclosure conflicted with the foreign policy embodied in the President's agreements, section 354.6's "different tack" of providing for the resolution of wartime claims through coercive litigation in California courts conflicts with article 4(a)'s expression of foreign policy. (See *Garamendi, supra,* 539 U.S. at p. 422 [123 S.Ct. at p. 2391].) Under *Garamendi,* the expression of federal policy embodied in the 1951 Treaty and the conflict raised by section 354.6 "are alone enough to require state law to yield." (*Garamendi, supra,* 539 U.S. at p. 424 [123 S.Ct. at p. 2392].)

■ It does not matter that Jeong's claims are against private Japanese corporations rather than against the government of Japan. *Garamendi* made clear that "[v]indicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed." (*Garamendi, supra,* 539 U.S. at p. 420 [123 S.Ct. at p. 2390].) The United States' policy that Korean claims should be resolved diplomatically included the claims of Korean nationals against Japanese "juridicial persons," i.e., corporations. (1951 Treaty, *supra,* art. 4(a), 3 U.S.T. at p. 3173.) Section 354.6 authorizes lawsuits against such corporations for whom the slave or forced labor was performed. (§ 354.6, subd. (b).) Just as HVIRA's compulsive requirement that private insurance companies disclose insurance policy information conflicted with the federal executive's foreign policy that such disclosure be voluntary, section 354.6's authorization of lawsuits against private Japanese corporations for wartime conduct conflicts with the federal policy embodied in article 4(a) that claims against such entities should be resolved diplomatically.

■ Jeong seeks to distinguish *Garamendi* by contending that unlike the executive agreements at issue in that case, which provided compensation to Holocaust victims, there has been no current federal attempt to establish a similar compensation system for WWII victims of the Japanese government. Jeong misreads *Garamendi* and the 1951 Treaty. The executive agreements in *Garamendi* did not necessarily provide compensation to Holocaust victims. Indeed, as the dissent pointed out, the voluntary system encouraged by the President had yielded settlement of "only a tiny proportion of the claims," and the insurers' disclosure of policy information had not been "significant." (*Garamendi, supra,* 539 U.S. at p. 432 [123 S.Ct. at p. 2396] (dis. opn. of Ginsburg, J.).) The Court's focus in *Garamendi* was HVIRA's conflict with the President's foreign policy embodied in the agreements encouraging the voluntary disclosure of insurance policy information and the nonadversarial settlement of insurance claims. Just as the effectiveness of the President's

foreign policy was irrelevant to the *Garamendi* majority's conflict determination (*id.* at p. 426 [123 S.Ct. at p. 2393]), it is likewise irrelevant whether the government-to-government negotiation contemplated by article 4(a) will result in satisfactory results.

Jeong further contends section 354.6 merely seeks to extend the statute of limitations for claims asserted in California courts, a state interest present in this case that was lacking in *Garamendi*. The *Garamendi* court rejected a similar claim that HVIRA's disclosure requirement simply protected the legitimate consumer protection interests of California residents. The Court noted the state interest expressed by the statute clearly showed a concern for the thousands of Holocaust survivors living in the state. The Court said, "As against the responsibility of the United States of America, the humanity underlying the state statute could not give the State the benefit of any doubt in resolving the conflict with national policy." (*Garamendi, supra,* 539 U.S. at p. 426 [123 S.Ct. at p. 2393].)

█ Similarly in this case, it does not matter if section 354.6 is characterized as a legitimate procedural statute enacted within an area of traditional state competence. As with HVIRA's stated purpose of addressing the insurance claims of Holocaust survivors, which was in conflict with the President's foreign policy, the express reason behind section 354.6 is to assure the "[t]housands of victims of Nazi persecution, and the heirs of victims of Nazi persecution . . . are given a reasonable opportunity to claim their entitlement to compensation for forced or slave labor performed prior to and during the Second World War." (Sen. Bill No. 1245 (1999–2000 Reg. Sess.) § 1(a) & (b).) This interest, while noble, conflicts with the federal policy embodied in articles 4(a), 14(b), and 26 of the 1951 Treaty.

### 3. *Section 354.6's Preemption Is Constitutional.*

█ Finally, Jeong argues that preempting his claims under section 354.6 would be unconstitutional because it would result in taking his property rights without just compensation and violate his right to equal protection of the laws. He points to a footnote in *Garamendi* indicating preemption of state law by executive agreements is "[s]ubject . . . to the Constitution's guarantees of individual rights." (*Garamendi, supra,* 539 U.S. at p. 417, fn. 9 [123 S.Ct. at p. 2387, fn. 9].) These arguments have no merit because *Garamendi* specifically upheld the federal government's ability to constitutionally resolve wartime claims of private parties by executive agreement.

The Court noted that making executive agreements to settle claims of American nationals against foreign governments is a longstanding practice dating back to President George Washington's settlement of the claims made

by American citizens against the Dutch government for loss of cargo to Dutch privateers. (*Garamendi, supra,* 539 U.S. at p. 415 [123 S.Ct. at p. 2387].) The Court said it did not matter that the President's agreements regarding Holocaust-era insurance policies addressed claims against corporations rather than foreign governments. The Court noted: "Historically, wartime claims against even nominally private entities have become issues in international diplomacy . . . . Acceptance of this historical practice is supported by a good pragmatic reason for depending on executive agreements to settle claims against foreign corporations associated with wartime experience. As shown by the history of insurance confiscation mentioned earlier, untangling government policy from private initiative during war time is often so hard that diplomatic action settling claims against private parties may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments. . . ." (*Id.* at p. 415 [123 S.Ct. at p. 2387].) Thus, "resolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs." (*Id.* p. 420 [at p. 2390].)

A division of the Fourth Appellate District recently rejected similar constitutional arguments. In response to arguments by American POW plaintiffs that preemption of their section 354.6 claims by the 1951 Treaty would result in an unconstitutional taking of their right to sue, the court recognized the United States Constitution is clear that only the federal government has the power to make war and peace with foreign nations, and that power specifically includes the authority to make peace treaties. (*Mitsubishi, supra,* 113 Cal.App.4th at p. 77.) This power necessarily implies the ability to constitutionally foreclose litigation of war-related claims: "It is therefore inescapable that the claims of American nationals arising out of duly declared war against foreign nationals as part of the prosecution of that war may be constitutionally compromised in a peace treaty. . . . If the United States government did not have the constitutional power to resolve claims *arising out of war* by American citizens against foreign nationals, then it would not have the power to conclude a genuine peace treaty." (*Id.* at p. 78, original italics.)

The court recognized, as we do in this case, that *Garamendi*'s conclusion regarding the federal government's ability to constitutionally resolve wartime claims of private parties by executive agreement is even more compelling where a treaty expresses a federal policy regarding those claims: "If, in *Garamendi,* the high court would see no constitutional impediment to the *federal executive's* efforts to compromise property claims of civilian Holocaust victims, then a fortiori there can be no constitutional impediment where a *treaty* (not just the unilateral efforts of one administration) compromises claims of American combatants for actions taken against those combatants as prisoners of war by a foreign government and its nationals during time of war

as part of the foreign government's overall war effort." (*Mitsubishi, supra,* 113 Cal.App.4th at p. 79, original italics.)

The fact that Jeong was a Korean national when his war claims arose does not diminish the federal government's constitutional power to declare, as a matter of United States foreign policy, how his claims should be resolved, as it has done in the 1951 Treaty. The insurance claims addressed by the President's agreements in *Garamendi* were indeed asserted by Americans against foreign companies. But, just like Jeong, those Holocaust victims were foreigners at the time their claims arose. Just as the Supreme Court perceived no constitutional impediment to the resolution of those claims by executive agreement, we see none where the federal determination has been made by treaty. (See *Deutsch, supra,* 324 F.3d at p. 714, fn. 14 ["When the United States has been a party to a war, the resolution it establishes to that war is the resolution for the whole of the United States. States lack the power to modify that resolution, regardless of the citizenship of those seeking redress"].)

### D. *Conclusion.*

 Under *Garamendi's* "conflict" theory of foreign affairs preemption, state law is preempted where that law conflicts with the foreign affairs policy embodied in presidential agreements with foreign leaders. The 1951 Treaty embodies the determination of the United States that claims of non-signatory nations like Korea, and their nationals, were to be resolved with Japan by government-to-government negotiations. In contrast, by enacting section 354.6, the California Legislature has allowed those claims to be litigated in our courts. *Garamendi* compels our conclusion that by allowing WWII slave or forced labor victims to be resolved in court, California's law conflicts with the foreign policy expressed in the 1951 Treaty. As a result, we hold the treaty preempts section 354.6.[10]

### DISPOSITION

The petition for writ of mandate is granted. The trial court is ordered to vacate its order denying the motion for judgment on the pleadings and enter a new order granting the motion and dismissing the action. The order to show cause, having served its purpose, is discharged. Our previous order staying trial court proceedings is dissolved.

---

[10] As we have noted, in addition to his action under section 354.6, Jeong also asserted causes of action for unjust enrichment, injuries in tort, including battery, intentional infliction of emotional distress, and unlawful imprisonment, as well as unfair business practices under Business and Professions Code section 17200 et seq. These causes of action have, of course, long expired. (See *Mitsubishi, supra,* 113 Cal.App.4th at p. 59.) Because we hold the 1951 Treaty preempts section 354.6, Jeong's remaining causes of action are time-barred.

In the interests of justice, each side will bear its own costs.

Cooper, P. J., and Rubin, J., concurred.

**RUBIN, J.,** Concurring.—"*It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.*" *(New State Ice Co. v. Liebmann* (1932) 285 U.S. 262, 311 [76 L.Ed. 747, 52 S.Ct. 371] (dis. opn. of Brandeis, J.), italics added.*)*

I join in the majority opinion, which I have signed and which I believe is compelled by the United States Supreme Court opinion in *American Ins. Ass'n v. Garamendi* (2003) 539 U.S. 396 [156 L.Ed.2d 376, 123 S.Ct. 2374] *(Garamendi)*. As an intermediate appellate court we are obligated to follow United States Supreme Court precedent in matters involving federal constitutional law. (See *Chesapeake & Ohio Ry. v. Martin* (1931) 283 U.S. 209, 220–221 [75 L.Ed. 983, 51 S.Ct. 453, 458]; *Perkins Mfg. Co. v. Jordan* (1927) 200 Cal. 667, 678 [254 P. 551]; *People v. Superior Court (Moore)* (1996) 50 Cal.App.4th 1202, 1211 [58 Cal.Rptr.2d 205].)

I write separately only to note the consequences of applying implied preemption in this setting. Certainly, the federal government in making executive agreements or treaties can expressly preempt state statutes that intrude in an area that the federal government considers sacrosanct. All that is required is an affirmative declaration by Congress that federal law prohibits state regulation. (*Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 738 [85 L.Ed.2d 728, 105 S.Ct. 2380] *(Metropolitan)*; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516–518 [120 L.Ed.2d 407, 112 S.Ct. 2608]; see also *Tafflin v. Levitt* (1990) 493 U.S. 455, 458–459 [107 L.Ed.2d 887, 110 S.Ct. 792] [it is presumed Congress ordinarily does not intend to displace existing state authority].) In those instances, the supremacy clause mandates that state interests must yield to paramount federal concerns. *Garamendi* and our majority opinion, however, are founded on a form of implied preemption also authorized as a matter of federal constitutional principle. (*Metropolitan, supra,* 471 U.S. at p. 738.) In the former, the court concluded that federal policy is to resolve Holocaust claims through diplomacy. In the latter, we state implied federal policy dictates that claims of Korean nationals against Japan are also to be resolved through diplomatic channels.

In some respects the present case is a stronger one for federal preemption. As the majority points out, *Garamendi* deals with unilateral presidential agreements. The present matter deals with a ratified treaty, "the ultimate formal expression of the federal executive and legislative branches in matters

of foreign policy." (Maj. opn., *ante,* p. 393.) Nevertheless, applying implied preemption here dramatically tips the balance between state and federal power in favor of the latter when, by definition, the federal government has not spoken expressly on the subject. The United States Supreme Court has addressed state powers vis-a-vis the federal government on a number of occasions in recent years. (See, e.g., *Federal Maritime Comm'n v. South Carolina Ports Authority* (2002) 535 U.S. 743 [152 L.Ed.2d 962, 122 S.Ct. 1864].) We have been reminded that " '[t]he "constitutionally mandated balance of power" between the States and the Federal Government was adopted by the Framers to ensure the protection of "our fundamental liberties." ' " (*Id.* at p. 769, 122 S.Ct. at p. 1879.) By guarding against encroachments by the federal government on matters preserved for the states, "we strive to maintain the balance of power embodied in our Constitution" and to " 'reduce the risk of tyranny and abuse from either front.' " (*Ibid.*; see also *Gregory v. Ashcroft* (1991) 501 U.S. 452, 458 [115 L.Ed.2d 410, 111 S.Ct. 2395].)

Here, the 1951 Treaty is silent on claims involving Korean nationals. Code of Civil Procedure section 354.6, the California statute in question, essentially extends the statute of limitations for certain common law claims that would otherwise be time barred. The enactment of statute of limitations has been historically a matter left to the wide discretion of each state. (See *Sun Oil Co. v. Wortman* (1988) 486 U.S. 717, 722 [100 L.Ed.2d 743, 108 S.Ct. 2117].) Given the lack of express preemption in an area traditionally reserved for the states, the doctrine of implied preemption should be used sparingly. This is especially so since the federal government may easily negate state power by simply stating its intent to do so in the applicable legislation, agreement or treaty. Under these circumstances, Justice Ginsberg's words in her dissent in *Garamendi* are particularly convincing: "Although the federal approach differs from California's, no executive agreement or other formal expression of foreign policy disapproves state disclosure laws like the HVIRA. Absent a clear statement aimed at disclosure requirements by the 'one voice' to which courts properly defer in matters of foreign affairs, I would leave intact California's enactment." (*Garamendi, supra,* 539 U.S. at p. 430 [123 S.Ct. at p. 2395].) Even though from this vantage point it is difficult to see that preemption is "implicitly contained in [the 1981 Treaty's] structure and purpose" (*Metropolitan, supra,* 471 U.S. at p. 738), I agree with the majority that, since Justice Ginsberg's words are found in her dissent, we must vacate the trial court's order under *Garamendi*'s compulsion.

The petition of real party in interest for review by the Supreme Court was denied July 14, 2004.